# EXHIBIT A

1   MATTHEW LEWIS (SBN 155516)
    Email: mlewis@whitecase.com
2   WHITE & CASE LLP
    555 South Flower Street, Suite 2700
3   Los Angeles, CA 90071-2433
    Telephone:  (213) 620-7700
4   Facsimile:   (213) 452-2329

5   JEREMY T. ELMAN (SBN 223696)
    email: jelman@whitecase.com
6   WHITE & CASE LLP
    3000 El Camino Real
7   Two Palo Alto Square, Suite 900
    Palo Alto, CA  94306
8   Telephone:  (650) 213-0300
    Facsimile:   (650) 213-8158

9   STEFAN M. MENTZER (admitted *pro hac vice*)
    email: smentzer@whitecase.com
10  TIMOTHY F. KEEGAN (admitted *pro hac vice*)
    email: timothy.keegan@whitecase.com
11  DANIEL LEDESMA (admitted *pro hac vice*)
    email: daniel.ledesma@whitecase.com
12  WHITE & CASE LLP
    1221 Avenue of the Americas,
13  Floor 49 Reception
    New York, NY  10020
14  Telephone:  (212) 819-8200
    Facsimile:   (212) 354-8113

15  Attorneys for Defendant NetEase, Inc.

16

17

18                   UNITED STATES DISTRICT COURT

19                  CENTRAL DISTRICT OF CALIFORNIA

20

21  ALEXANDER STROSS, an                Case No.  2:20-cv-00861 AB(PJWx)
    individual,

22                                      **SUPPLEMENTAL DECLARATION**
                     Plaintiff,         **OF JACQUES DELISLE IN**
23                                       **SUPPORT OF NETEASE'S MOTION**
          v.                             **TO DISMISS FOR *FORUM NON***
24                                       ***CONVENIENS***
    NETEASE, INC., et al.,
25                                      Judge:  Hon. Andre Birotte Jr
                     Defendants.

26

27

28

1

## DECLARATION OF JACQUES DELISLE

2

3    I, Jacques deLisle, declare:

4         1.    I am the Stephen A. Cozen Professor of Law, Professor of Political

5    Science, Director of the Center for the Study of Contemporary China, and Co-

6    Director of the Center for Asian Law at the University of Pennsylvania.  I submit

7    this declaration in support of the motions to dismiss filed by NetEase, Inc. on

8    grounds of *forum non conveniens*.  Specifically, I offer this declaration to address

9    the rights and remedies available under the laws of the People's Republic of China;

10   the procedures, quality, and reputation of Chinese courts that would adjudicate

11   Plaintiff's claims, including actions for copyright infringement; and the availability

12   of Chinese courts to hear the claims for copyright infringement asserted by

13   Plaintiffs Alexander Stross, Ralph Ledergerber, John Walmsley, and Bernhard

14   Kühmstedt (collectively, "Plaintiffs").

15   **I.    BACKGROUND AND QUALIFICATIONS**

16        2.    My most recent C.V. is attached to this Declaration.  In addition to the

17   positions listed in the preceding paragraph, from 2009 to 2019, I was Director of

18   the Center for East Asian Studies at the University of Pennsylvania (which was, for

19   most of that period, a federally funded National Resource Center for East Asian

20   Studies).

21        3.    My research, writing, and teaching for more than thirty years have

22   focused on contemporary Chinese law and Chinese politics and policy.  My

23   research has included work on Chinese courts and judicial processes, Chinese tort

24   law and other issues of civil law and economic law, the role of law in China's

25   economic development policies, China's approach to private and public

26   international law, the rule of law in China, and China's foreign relations.

27        4.    I specialized in Chinese law and Chinese politics while earning my

28   J.D. at Harvard Law School and in the Ph.D. program in the Government

- 1 -

1  Department at Harvard University. I also focused partly on Chinese politics and
2  policy at the Woodrow Wilson School at Princeton University, where I received an
3  A.B.

4       5.     I have published scholarship on these subjects in law reviews,
5  international affairs journals, edited volumes, and other media. I regularly conduct
6  research on law, politics, and domestic and foreign policy in contemporary China,
7  and I regularly monitor new laws and legal, political, and economic developments
8  in China.

9       6.     At the University of Pennsylvania (and as a visiting professor at other
10  leading universities in East Asia and elsewhere), I teach courses and supervise law,
11  social science, and business graduate students' theses and doctoral dissertations
12  focusing on legal, political, and economic issues in contemporary China and
13  China's external legal relations and foreign relations. I am a member of the faculty
14  graduate group and have taught in the core curriculum of the Lauder Program at the
15  Wharton School, a program that awards a joint M.B.A.-M.A. degree in regional
16  studies, including in Chinese studies.  I have taught courses on Chinese law at
17  universities abroad, including the National University of Singapore and Tel Aviv
18  University.

19       7.     In addition to the China-focused work described above, I also conduct
20  research and have published in the fields of international law, comparative law, tort
21  law, and international law-related aspects of United States law. I have taught Torts
22  at Penn since 1994 and a course on the common law of torts and contracts for civil
23  lawyers at Waseda University in Tokyo. I also regularly teach courses on public
24  international law, comparative law and politics, and international relations. I have
25  been an honorary professor at Renmin University Law School, and I am an
26  inaugural member of the global faculty of Peking University Law School, both of
27  which are among China's top law schools.

28

- 2 -

8.      I have served as a consultant, advisor, or lecturer for programs on United States and international law for Chinese lawyers, and programs supported by the United States government, major private foundations and international organizations to provide advice to People's Republic of China (PRC) legislation-drafters and government officials, primarily in the fields of civil and economic law (including torts, property, company law, foreign investment and intellectual property) and legal controls of government regulation (including administrative procedure law). I also have conducted substantial research and scholarship on foreign legal advice and assistance programs (including those focusing on economic law and rule-of-law reforms) targeting China and other transitional post-socialist states.

9.      I am a member of the National Committee on United States-China Relations. I am a senior fellow and director of the Asia Program at the Foreign Policy Research Institute, where I oversee, and contribute to, lecture series, conferences, and publications on issues that include law, politics, economics and policy in the greater Chinese region. I have twice been vice chair of the Pacific Rim Interest Group of the American Society of International Law. I am a member of the International Academy of Comparative Law, the Board of Directors of the American Society of Comparative Law, and the Board of Directors of the American Association of Chinese Studies. I contribute to scholarly and policy-related programs on contemporary Chinese law and politics for such organizations. I regularly serve as a peer-reviewer for major United States and East Asian scholarly journals and presses in fields relevant to my scholarship, and for major United States and foreign providers of funding for academic research on the law and politics of the PRC. I serve on the editorial boards of several journals in my fields of specialization and as the co-editor of a series of books on Chinese law.

10.      Before joining the faculty at Penn, I did substantial work on issues of Chinese law and country conditions and aspects of China's external relations in my

- 3 -

1     capacity as an attorney-advisor in the Office of Legal Counsel in the Department of

2     Justice and in association with leading U.S.-based international law firms.

3          11.     I have twice been a member of the U.S. delegation to the U.S.-China

4     Rule of Law Dialogue (a senior-level "track 1.5" dialogue—that is, mixed

5     government official and academic / think tank private sector). I frequently make

6     presentations to the U.S. policy community (congressional commissions and staff,

7     think tank sessions and task forces, and executive branch groups or individuals) on

8     policy-relevant issues of China and China-related law and policy.

9          12.     I have served as an expert witness and consultant on matters of

10    Chinese law, policies, and practices in litigation in United States federal and state

11    courts, arbitration proceedings and proceedings before federal agencies in many

12    cases over more than fifteen years. The issues on which I have opined include

13    those related to *forum non conveniens* (including the availability and adequacy of

14    Chinese law and a Chinese forum) and bases for the enforcement of, or deference

15    to, Chinese court decisions by U.S. courts, Chinese tort law, intellectual property

16    law and contract law, Chinese civil procedure law and judicial process, Chinese law

17    on choice of law and transnational judicial proceedings, Chinese laws, policies and

18    practices concerning foreign investment and foreign companies' participation in the

19    Chinese economy, and China's economic development policies and industrial

20    policy.

21         13.     I have conducted extensive research in residence in China. Since 1986,

22    I have traveled regularly to China and on several occasions been a visiting scholar

23    or visiting researcher at major research universities in the region. I have frequent,

24    extended discussions with PRC lawyers, judges, legal academics, social scientists,

25    government officials and ordinary Chinese citizens in China and elsewhere. I read

26    Chinese and speak Mandarin, the standard national dialect of Chinese. Much of my

27    research is conducted in that language.

28

14.    I also have undertaken extensive research outside of the PRC on matters relating to Chinese law, politics, and economics. In that capacity, I have reviewed documentary evidence and conducted many interviews of lawyers who advise and represent non-PRC clients who conduct business in China, non-PRC business people who conduct business in China, and government officials and foundations, industry organizations, and other non-profit officers who have been involved in promoting or monitoring economic and legal reform in China.

15.    In connection with this declaration, I have reviewed a variety of sources, including the allegations in the complaints filed against NetEase, Inc. by Plaintiffs.

## II.    OVERVIEW OF OPINIONS

- Chinese law and courts provide mechanisms by which parties can and do regularly sue and win suits to protect intellectual property rights (including copyright and including in cases involving facts or issues generally similar to those alleged by Plaintiffs in this case) and to secure a range of remedies.  Multiple defendants whose actions contribute to infringement can be held liable based on doctrines governing joint and several liability for joint and concurrent tortfeasors, and liability for aiding and abetting.

- Relevant Chinese law parallels or implements provisions in the major international intellectual property treaties, to which China is a party, and more generally conforms to international intellectual property law standards. In appropriate circumstances, Chinese courts are authorized to apply foreign law and provisions of treaties to which China is a party.

- The Chinese courts and judicial processes that would adjudicate Plaintiffs' claims in many respects parallel those of other countries and provide elaborate procedures for civil adjudication.  China receives relatively high marks in comparative "rule of law" rankings (near international

- 5 -

medians).  U.S. courts overwhelmingly  have found China to provide an available and adequate forum for *forum non conveniens* and similar purposes, including in intellectual property rights cases.

• Plaintiffs' claims would be heard by Chinese courts that are of especially high quality, specifically intellectual property courts or internet courts in economically developed and internationally open regions of China (specifically including Beijing and Guangzhou).

• China has legal and policy commitments and interests that support protection of intellectual property rights, and a regime for protecting intellectual property that is consistent with international legal obligations and norms.

• China has a significant interest in having Chinese courts adjudicate intellectual property claims with significant connections to China. Chinese rules and practices governing transnational litigation pose significant difficulties for litigating Plaintiffs' claims in the United States.

## III. CHINESE LAW PROTECTS INTELLECTUAL PROPERTY RIGHTS, INCLUDING COPYRIGHTS, AND PROVIDES REMEDIES, INCLUDING DAMAGES AND INJUNCTIVE RELIEF.

16.    If a Chinese court were to determine that Chinese law is applicable to Plaintiffs' case, the Chinese laws that a Chinese court would apply are in many respects similar to U.S. law and other foreign law.  Chinese intellectual property law provides remedies for copyright infringement and other related harms, and is in many respects similar to U.S. law and other foreign law, including U.S. laws that Plaintiffs invoke as a basis for their claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.     The laws of the People's Republic of China: protect intellectual property rights, including copyrights in photographic works by foreign creators; provide a range of remedies, including damages and injunctive relief; and provide that multiple defendants may be held liable for infringement under principles including joint and several liability, and aiding and abetting.**

17.     Chinese copyright laws are enacted within the framework set forth in the Constitution of the People's Republic of China.  The Constitution provides for the legal protection of interests that include copyright and other intangible property.[1]  The General Provisions of Civil Law of the People's Republic of China ("General Provisions") and the General Principles of Civil Law of the People's Republic of China ("General Principles") provide for the legal protection of copyrights.  The General Provisions and, before them, the General Principles, serve as a framework for civil law, providing the basic principles that apply to all civil law relationships and civil law rights (including intellectual property rights).[2]

18.     It is well-established and uncontroversial in Chinese law and practice that plaintiffs can, and do, bring successful claims directly under provisions in the General Provisions and General Principles, as well as under the more specialized intellectual property laws (such as those concerning copyright).  The General Provisions and General Principles provide that legal and natural persons, including foreigners, may hold civil law rights conferred by laws (including the General Provisions and General Principles themselves, and other laws and regulations such

---

[1] Constitution of the People's Republic of China (1982, as amended through 2018), arts. 5, 11, 13, 20, 32.
[2] The General Provisions of Civil Law (2017) largely superseded the General Principles of Civil Law (initially adopted in 1987, amended 2009).  The General Principles, however, have not been repealed and thus remain a valid source of law. Where there is a conflict between the two, the General Provisions govern.

- 7 -

as those concerning copyright), that such rights are protected by law, that such rights generally may be assigned in whole or in part by contract, and that no organization or individual is permitted to infringe those rights.[3]

19.     Among the civil law rights that the General Provisions and the General Principles specifically recognize and protect are intellectual property rights, including rights of authorship / copyright in "works," patent rights, trademark rights, and other rights of "invention."[4]  The Tort Liability Law also protects a similar range of rights, including specifically "copyright" and "other personal and property rights and interests."[5]

20.     The terminology—and the legal meaning of those terms—in Chinese copyright law are generally consistent with copyright law elsewhere in the world, including the United States.   As is addressed more fully below, this is so in part because Chinese copyright laws have been crafted to conform to the demands of international treaties and the obligations China incurred when it joined the World Trade Organization and accepted the TRIPS requirements for intellectual property, including copyright.

21.     The Copyright Law of the People's Republic of China ("Copyright Law") and the Implementing Regulations for the Copyright Law ("Copyright

---

[3] General Provisions of the Civil Law of the People's Republic of China (2017), chs. 5, 8 (civil law rights and obligations), art. 3 (legal protection of civil law rights) General Principles of Civil Law of the People's Republic of China (1987, as amended through 2009), ch. 5 (civil law rights and obligations), ch. 8 (applicability to civil law rights and relationships involving foreign parties), art. 5 (legal protection of civil law rights).

[4] General Provisions, arts 123 (setting forth intellectual property rights), 120 (liability for infringement); General Principles, arts. 94-97 (setting forth intellectual property rights), 118 (liability for infringement).

[5] Tort Liability Law of the People's Republic of China, art. 2 (2010). Under the General Provisions, General Principles and in Chinese civil law generally, copyrights and many other civil law rights are not restricted to Chinese nationals and may be held by foreigners.

1   Regulations"), protect "works" (*zuopin*) defined broadly as "intellectual creations"

2   (*zhili chengguo*) in the fields of literature, arts, natural or social science,

3   engineering, technology and other similar fields (*deng*), that have "originality"

4   (*juyou duchuang xing*) and can be produced / reproduced in a tangible form (*neng*

5   *yi mou zhong youxing xingshi*).  Among the specific examples of original works

6   that are protected are "photographic works" (*sheying zuopin*)—which are defined as

7   "artistic works created by recording images of objects on light-sensitive or other

8   materials with the aid of devices."[6]

9        22.    Works of foreign creators outside of China are protected under

10   Chinese law where  the foreigner's work enjoys copyright protection under an

11   international treaty to which both the foreigner's state and China are parties.[7]  The

12   U.S. and China (as well as Australia, Germany, and the United Kingdom) are

13   parties to copyright-relevant treaties, including the Berne Convention for the

14   Protection of Literary and Artistic Works (which requires "national treatment"—

15   that is, each party must provide protection of works originating in another party the

16   same protection accorded to works produced by its nationals), the World

17   Intellectual Property Organization Copyright Treaty (which embodies Berne

18   Convention standards and addresses the protection of works and creators' rights in

19   the digital environment), the Universal Copyright Convention, and the Trade-

20   Related Aspects of Intellectual Property Rights (the TRIPS Agreement, under the

21   WTO Agreement, which requires, *inter alia*, compliance with Berne Convention

22

23   _____

24   [6] Copyright Law of the People's Republic of China (2001 as amended, 2010), arts.
     2, 3; State Council of the People's Republic of China, Implementing Regulations
25   for the Copyright Law, arts. 2-4 (2013).

26   [7] Copyright Law, art. 2; General Principles of Civil Law (1987, 2009), art. 142 ("If
     any international treaty concluded or acceded to by the People's Republic of China
27   contains provisions differing from those in the civil laws of the People's Republic
     of China, the provisions of the international treaty shall apply, unless the provisions
28   are ones on which the People's Republic of China has announced reservations").

- 9 -

1  requirements and enforcement of intellectual property rights).[8]  China has adopted

2  domestic law regulations to implement the international copyright treaties to which

3  it is a party, and explicitly to protect foreign works consistent with those treaty

4  obligations.[9]

5        23.    The creator is (absent other legal provision or agreement assigning

6  rights) the owner of the copyright.  The owner of the copyright generally enjoys

7  exclusive rights to publish, alter (or reject alteration), exhibit, produce, reproduce,

8  distribute (including over "information networks" (*tongguo xinxi wangluo*)

9  including the internet) and disseminate a work, and to license others to conduct

10  such activities.  (The creator also has rights of attribution.)  Infringement, including

11  in the form of production / reproduction without permission, distortion, exploitation

12  without payment, copying, exhibiting, or disseminating/distributing—including

13  over information networks / the internet—and other acts of infringement of

14  copyright or related rights, is prohibited.[10]

15        24.    Infringement of a creator's (or other copyright holder's) copyright

16  includes actions of dissemination of a work over an information network (including

17  the internet) by network users and internet service providers.  Such dissemination

18  includes a wide range of means that allow the general public to download, browse

19  or otherwise obtain the work.[11]

20  _____

21  [8] Copyright relations between China and the United States were established,
effective March 17, 1992, by a presidential proclamation pursuant to 17 U.S.C. §

22  104. *See* United States Copyright Office, International Copyright Relations of the

23  United States, Circular 38A (Oct. 2019), n. 14.

24  [9] State Council of the People's Republic of China, Rules on the Implementation of
International Copyright Treaties (1992).

25  [10] Copyright Law, arts. 9-11, 20-21, 47-48, 57.

26  [11] Supreme People's Court, Provisions on Several Issues in the Application of Law
in Cases of Civil Disputes Involving the Right of Dissemination through

27  Information Networks, arts. 2 (2012) ("Information Networks Provisions").  These
Provisions supersede an earlier, similar set of provisions and amendments thereto.

28  *See also* Beijing High  People's Court, Guiding Opinions (I) on Several Issues

- 10 -

25.     Where one party uses / exploits (*shiyong*) another's work, the user / exploiter must clearly indicate the identity of the creator of the work (unless the parties agree otherwise).[12] Chinese copyright law is generally understood to recognize both economic and moral rights of copyright owners.

26.     China's laws set forth remedies for infringement of the copyright and related rights conferred by the substantive laws described above.  These include damages and injunctive relief. The General Principles provide that the victim of infringement of covered intellectual property rights has "the right to demand cessation of the infringement, elimination of the [harmful] effects and compensation for harms suffered."[13]  The General Provisions adopt different language but maintain the same basic legal rule in providing that the victim of "an infringement of civil law rights" (including copyright) has a right to require the infringer to assume "tort liability" (which includes compensation and cessation of infringement).[14]

27.     More broadly, the General Provisions and General Principles provide that those who infringe the civil law rights of another must "assume civil liability" in forms that include (but are not limited to) ceasing the infringement, restoring the (pre-infringement) original state of affairs, eliminating the harmful effects of the infringement, paying compensation for harm, and making an apology.[15]  The Tort Liability Law provides for essentially the same modes of assuming liability for tortious infringement of civil law rights, including copyright.[16]

---

Concerning the Trial of Cases Involving Copyright Disputes in Cyberspace (for Trial Implementation) arts. 1, 2, 4 (2010).

[12] Copyright Regulations, art. 19; cf. Copyright Law, art. 10(2).
[13] General Principles, arts. 118, 134.
[14] General Provisions art. 120.
[15] General Principles, arts. 118, 134; General Provisions, arts. 120, 179.
[16] Tort Liability Law, art. 15.

- 11 -

1    28.    The Copyright Law and Copyright Regulations similarly provide that

2    an infringer must bear civil liability in a manner appropriate to the circumstances of

3    the case, in forms that include (but are not limited to) ceasing the infringement (that

4    is, injunctive relief), eliminating the harmful effects, paying compensation for

5    harm, and making an apology.  These remedies are available for all forms of

6    infringement, including disseminating another's work without permission or

7    without payment of agreed upon price, distorting or falsifying [*waiqu, cuangai*]

8    another's work, and other forms of infringement.  Rules governing infringement of

9    dissemination rights over the internet require internet service providers to take steps

10   to cease the infringement, such as timely deletion of infringing content.

11   29.    Compensation is to be made on the basis of the right-holder's actual

12   losses (which can be computed based on lost sales volume in the case of copyright

13   infringement) or, where those are difficult to determine, on the basis of the

14   infringer's unlawful gains or, where neither can be determined, an award of up to

15   500,000 *renminbi* per work (which is roughly equivalent to $73,000 USD as of the

16   date of this declaration), based on the seriousness of the infringing act.  The

17   infringer is also liable for the reasonable costs incurred by the right-holder in

18   ending the infringement. Chinese courts often award costs to the prevailing party.

19   Where a right-holder can demonstrate irreparable harm from ongoing infringement,

20   the court also may grant immediate interim injunctive relief.  Administrative

21   authorities also may issue orders requiring an infringer to cease infringement (and

22   imposing fines and confiscating materials and property) where the public interest is

23   threatened.  Administrative and criminal sanctions for infringers are also possible

24   under some conditions.[17]

25   _____

26   [17] Copyright Law, arts. 47-53; Copyright Regulations, art. 36; Supreme People's
     Court, Interpretation Concerning Certain Questions in the Application of Law in

27   Adjudicating Copyright Civil Disputes, arts. 1, 20, 24-26, 29 (2002) ("Copyright
     Interpretation"); Information Networks Provisions, art. 13-14. *See also* Beijing

28   High People's Court, Guiding Opinions on Determining Compensation Liability for

30.     Chinese law is consistent with Chinese courts providing remedies in intellectual property cases where actions in China have effects in other jurisdictions.  The remedies provisions in the Copyright Law and Copyright Provisions do not state or imply any restriction to harmful consequences occurring in China or exclusion of remedies for acts of infringement that emanate from China and extended elsewhere.  The provisions speak only to awards that enjoin activities, provide damage awards, or impose sanctions for acts that infringe on the rights of a rights-holder (including a foreign rights-holder).  The Chinese Copyright Law differs from many similar Chinese laws in that it does not contain in the initial, preamble-like, policy-oriented article a limitation to the regulation of activities or effects that occur only in the territory of China.

31.     To read such a narrowing territory-related meaning into Chinese copyright law would be inconsistent with contexts of policy and practice.  Officials and analysts in China, the United States, and elsewhere recognize that intellectual property protection and enforcement in China involve not just infringements that have effects in China's internal market but also infringements that have effects abroad.  For example, China's Ministry of Customs has elaborate procedures for stopping the export of infringing goods.  U.S. intellectual property rights-holders and customs authorities regard infringing exports from China to the U.S. as among the most significant issues in U.S.-China intellectual property relations.[18]  In a well-known case in China concerning intellectual property infringement claims, the court took it as an ordinary, unremarkable feature of the case that it would address infringement claims that focused in part on intellectual property that would be

_____

Harms Relating to Copyright Infringements (2005), providing extremely elaborate rules on remedies.

[18] *See, e.g.*, Jacques deLisle, "The Other China Trade Deficit: Export Safety Problems and Responses," in Cary Coglianese, Adam M. Finkel and David Zaring, eds. Import Safety: Regulatory Governance in the Global Economy 22-49 (2009).

embodied in items that were to be exported to the United States and intellectual property rights that the licensor sought to license on a worldwide basis.[19]

32.    Liability for infringement of copyrights in China is governed by civil law, tort law, copyright law and, in the cases of infringement through the internet, internet laws.  The General Provisions and General Principles, the Tort Liability Law (and other laws) provide for imposing joint and several liability where two or more defendants act jointly to infringe a civil law right (a category that includes copyrights), resulting in harm to the plaintiff.[20]  Joint and several liability also applies where one actor aids or abets/instigates (*bangzhu jiasuo*) another in committing a tortious act (a category that includes copyright infringement).[21]

_____

[19] Ye Ruosi, Zhu Jianjun and Chen Wenquan, "Judicial Application of FRAND Principles in a Standards-Essential Patent Royalties Dispute," *Electronics Intellectual Property*, Apr. 2013, 55-61; Ye Ruosi, Zhu Jianjun and Chen Wenquan, "Determination of Abuse of Market-Dominant Position by Standards-Essential Patent Owner Constituting Monopolistic Act" *Electronics Intellectual Property*, Mar. 2013, 46-52; "Chinese Courts Issue Landmark Decision Determining a FRAND Royalty Rate," ABA Intellectual Property Committee Tidbits, http://www.americanbar.org/content/dam/aba/publications/antitrust_law/at315000_tidbits_20130405.authcheckdam.pdf.  (Although the specific royalty rate set in the proceedings has been highly controversial and sharply criticized, the notion that the court properly would address activities with reach or effects outside China remains unexceptional.)

[20] General Provisions, art. 178; General Principles, art. 130; Tort Liability Law, art. 8; *see also* Copyright Interpretation, art. 5 (contemplating civil suits for copyright infringement involving joint defendants.  The Tort Liability Law makes clear that the plaintiff may seek full recovery from any of the defendants subject to joint and several liability.  Tort Liability Law, arts. 2, 8-15.

[21] Tort Liability Law, art. 9; Supreme People's Court, Opinions on Certain Questions Concerning Implementation of the General Principles of Civil Law (for Trial Implementation), art. 148 (1988) ("Opinions on Civil Law").

The Beijing High People's Court's Guiding Opinions on Determining Compensation Liability for Harms Relating to Copyright Infringements, in art. 4, notably provide for joint and several liability in copyright infringement cases where one defendant knows or should know that another defendant's conduct constitutes copyright infringement but the first defendant continuously aids (*bangzhu*) the second defendant, including by providing operational sites.

- 14 -

Where two or more actors act separately in committing a tort (*fenbie shishi qinquan xingwei*) that causes a single harm (including copyright infringement), they are both (or all) liable (although there is a presumption in favor of several liability where liability can be apportioned).[22]   The Tort Liability Law, which adopts the principle that liability should track fault, also provides that where a third party has caused the harm to a plaintiff, that third party also bears tort liability (*disan ren yingdang chengdan qinquan zeren*).[23]

33.     The Supreme People's Court's Information Networks Provisions and other rules governing internet service providers establish a similar framework of liability for multiple actors who infringe copyrights through the internet (or similar means).  The Provisions direct courts to find a joint tort (*gongtong qinquan xingwei*) and to impose joint and several liability (*liandai zeren*) on an internet service provider and other relevant actors where they through cooperation or other means (*fengong deng fangshi*) jointly provide a work (*gongtong tigong*)—that is, disseminating it over the internet.[24]   The Provisions also direct courts to impose liability on an internet service provider that aids or abets (*bangzhu jiaosuo*) a user in tortuously infringing on a rights-holder's right of dissemination.  This liability attaches where an internet service provider knew or should have known of the infringement—and this duty of care is higher when the internet service provider profits from the infringement.[25]

---

[22] Tort Liability Law, art. 12.
[23] Tort Liability Law, art. 28; *see also* art. 11.
[24] Information Networks Provisions, art. 4
[25] Information Network Provisions, arts. 7-9, 11-12.  *See also* Beijing High People's Court, Guiding Opinions (I) on Several Issues Concerning the Trial of Cases Involving Copyright Disputes in Cyberspace (for Trial Implementation) art. 19.

1

**B.      China is a party to the major international treaties for intellectual property rights protection and incorporates the provisions, or requirements, of those treaties and international standards in its laws.**

34.      Chinese copyright law (as well as much other Chinese intellectual property law) tracks international standards.  Although much contemporary Chinese law has borrowed extensively from foreign models and assimilated to global norms, this has been especially the case in the area of intellectual property law.  This point is widely recognized and uncontroversial.

35.      As a WTO member, China is a party to the Agreement on Trade-Related Aspects of Intellectual Property ("TRIPS").  The TRIPS agreement requires member states to comply with the substantive provisions of the Berne Convention.[26]  In relevant portions, China's Copyright Law (along with related regulations) tracks the Berne Convention, and China adopted regulations to implement the Berne Convention and other copyright treaties.[27]  As noted above, China is a party to the Berne Convention, the WIPO Copyright Treaty, and the Universal Copyright Convention.

36.      China's official position that it has brought its intellectual property laws into compliance with its international obligations provides an additional impetus for Chinese courts to construe the language of relevant Chinese laws in a manner consistent with the provisions of the TRIPS Agreement and the Berne Convention, and other major intellectual property treaties.  Even highly critical

[26] World Trade Organization Agreement, Annex 1C (TRIPS), arts. 9-14, 15-24, 39 & fn. 10 (concerning copyright and Berne Convention, trademarks, trade secrets and Paris Convention); Berne Convention, arts. 1-21 & App.
[27] China is also a party to the Madrid Agreement Concerning the International Registration of Marks and the related Madrid Protocol, and the Paris Convention for the Protection of Industrial Property.

accounts of China's intellectual property practices acknowledge that Chinese laws generally comply with international standards.

      **C.**    **Chinese choice of law rules indicate that a Chinese court shall apply Chinese law or, where appropriate, foreign, or international law to address Plaintiffs' claims.**

37.    In cases involving alleged infringement of intellectual property rights, Chinese courts apply the choice of law rules for tort cases generally and, where they exist, for intellectual property cases specifically.[28]  Where a case involves only Chinese parties and relevant actions in Chinese territory, China's laws—including the provisions discussed earlier in this declaration—would apply.  To the extent that the case involves a "foreign element," including where one or both parties is a foreign entity, where the subject matter is outside China's territory, or where infringing actions occur abroad, Chinese law directs Chinese courts to apply China's law on choice of law in foreign-related civil matters.

38.    The Law of the People's Republic of China on Law Applicable to Foreign-Related Civil Relationships (2010) ("Law on Choice of Law") includes a specific provision on intellectual property rights in foreign-related civil cases.  It provides that the "law of the jurisdiction where protection is claimed" (*qingqiu baohu di falu*)—that is, the internationally commonly accepted principle of *lex loci protectionis*—shall apply to question of the "ownership and content" (*guishu yu neirong*) of intellectual property rights, and to liability for intellectual property torts (*zhishichanquan de qinquan zeren*).[29]

---

[28] The analysis here applies to a case in which there is no contractual relationship between a plaintiff claiming infringement and the alleged infringer of an intellectual property right.  The Tort Liability Law explicitly covers intellectual property rights and thus confirms that tort law choice of law principles apply in intellectual property rights infringement civil cases. Tort Liability Law, art. 2.

[29] Law on Choice of Law, arts. 48, 50.  Article 50 allows, in the alternative, for the law of the forum jurisdiction to apply *if the parties so agree* (after the infringement

- 17 -

39.     To the extent that a Chinese court would view Plaintiffs' claims as constituting tort claims that are not resolved by the choice of law rules for intellectual property claims discussed in the preceding paragraph, the more general provisions governing the choice of law in tort cases involving a foreign element (a category that in Chinese law broadly includes intellectual property rights infringement) provide for the application of the law of the place of "the place of the tortious act."  The Law on Choice of Law directs that the "law of the place where the tort occurs" (*qinquan xingwei di falu*) applies in cases of tort liability (*qinquan zeren*).[30]  The General Principles include identical language in a provision on choice of law in claims for tort damages (*qinquan xingwei di sunhai peichang*).[31]  This is generally interpreted to mean "the law of the place where the tortious act is committed" (*qinquan xingwei shishi di falu*) or "the law of the place where the consequences of the tort occur" (*qinquan jieguo fasheng di falu*).[32]

---

has occurred).  *See also* Mo Zhang, Codified Choice of Law in China: Rules, Processes and Theoretic Underpinnings, 37 N.C. J. Int'l L. & Com. Reg. 83, 143-148 (2011); Zhengxin Ho, "An Imperfect Improvement: The New Conflict of Laws Act of the People's Republic of China," 60 Int'l & Comp. L. Q. 1065, 1090-1091 (2011).

[30] Law on Choice of Law, art. 44.  This law provides that more specific provisions on choice of law in other laws concerning foreign-related civil relations prevail in the event of a conflict with the Law on Choice of Law, but it makes an exception for article 146 of the General Principles (which contains the General Principles' provision on choice of law in tort cases generally).  Law on Choice of Law, arts. 2, 51, 52.

[31] General Principles, art. 146; Opinions on Civil Law, art.187.

[32] General Principles, arts. 142, 146; Opinions on Civil Law, arts.143-147, 178, 187.  The Opinions further provide that where the two laws are in conflict, the court may choose which law to apply.

      Chinese law also generally allows the parties to agree on the law governing their tort case (including an intellectual property rights infringement case).  This choice may include the law of the forum in cases concerning intellectual property rights.  Such agreement may be reached after the alleged tort has occurred Law on Choice of Law, arts 44, 50; General Principles, art. 146

- 18 -

40.     These choice of law rules do sometimes point Chinese courts to apply foreign law in copyright infringement and other intellectual property and other civil cases.  In addition, Chinese law includes other means by which international rules and norms may provide the law governing a case in a Chinese court.  Where a foreign party is involved in a lawsuit in a Chinese court, treaties to which China is a party and international practice are applicable through incorporation into Chinese law.  The General Principles provide that, any civil law rights provided by an international treaty to which China is a party apply in the case of civil law relations (a category that includes tort and tort-like claims) between Chinese and foreign parties, even if those provisions conflict with China's domestic legislation (unless China has entered a reservation to the relevant article).  China's implementing rules for international copyright treaties also bring elements of the treaties into Chinese law.  The General Principles further provide that "international practice may be applied" in cases of civil matters involving foreign parties where PRC laws and international treaties to which China is a party do not contain relevant provisions.[33]

41.     In sum, depending on the facts of a case, Chinese law authorizes and directs a Chinese court to apply Chinese law, relevant foreign law—including U.S. law—or the law set forth in relevant international treaties (or even international practice) in adjudicating civil cases—including copyright-related and other intellectual property cases—involving foreign parties or with a foreign element. Depending on the circumstances and issues, the relevant factors in determining which jurisdiction's law applies include a consideration of which jurisdiction's law the plaintiff claims protection of its intellectual property rights, where the infringing acts occurred (which in complex intellectual property torts can be several jurisdictions), where the consequences of the harm occurred, the content of any

[33] General Principles, art. 142; Civil Procedure Law of the People's Republic of China, art. 260 (2017) ("Civil Procedure Law").

- 19 -

relevant treaties to which China and other relevant states are parties, and agreement (even after the tort occurs) on governing law among the parties to the case.

IV.   **CHINA'S COURT SYSTEM AND JUDICIAL PROCESSES BROADLY PARALLEL THOSE OF OTHER LEGAL SYSTEMS AND RANK RELATIVELY HIGH IN CROSS-NATIONAL COMPARISONS; U.S. COURTS REPEATEDLY HAVE FOUND CHINA'S COURTS AND LAWS ADEQUATE FOR *FORUM NON CONVENIENS* PURPOSES.**

42.     Chinese courts provide a forum in which parties can and do regularly sue and win suits to protect copyright, trademark and other intellectual property rights, and secure a range of remedies (including damages and injunctive relief), including those described in the preceding sections of this declaration.

A.     **The adjudication process under Chinese law parallels that of other jurisdictions, including civil law jurisdictions, and provides elaborate rules and procedures for litigation, appeals, and enforcement in intellectual property cases.**

43.     The General Provisions, General Principles, Tort Liability Law, Copyright Law and other intellectual property laws, and Civil Procedure Law, and related regulations and other sources of law provide for adjudication by Chinese courts of cases alleging violations or infringements of civil law rights, including copyrights and other intellectual property rights.[34]  The Copyright Law and Copyright Interpretation clearly contemplate that copyright holders may bring suit in Chinese courts to protect the rights provided under the Copyright Law and other law.[35]  The General Principles' general provisions and their special chapter on

_____

[34] General Principles, arts. 8, 134-140; Civil Procedure Law, arts. 2-8, 259; cf. General Provisions, arts. 121, 123.

[35] Copyright Law, arts 48-51, 54; Copyright Interpretation, arts. 1-32.

- 20 -

foreign civil relations clearly contemplate: the extension of rights and obligations (including those to seek and win recovery in Chinese courts and to be subject to judicial process) to foreign parties; the adjudication by Chinese courts of a range of cases involving foreign activities and civil law relations; and the application of Chinese law, and foreign law, under various circumstances.  The Civil Procedure Law similarly: recognizes the "rights of parties to bring claims" in civil litigation and the obligations of courts to adjudicate those claims and uphold parties' legal rights in such cases; extends the rights and obligations of civil litigation on equal terms to foreign parties and PRC parties; and provides specific rules for courts' jurisdiction (as well as other matters) in cases brought by or against foreign parties, including those with no domicile in the PRC.  Foreign parties have the same litigation rights as PRC citizens and legal persons (with some minor adjustments, primarily affecting time limitations).[36]

44.     Chinese civil procedure laws provide elaborate rules setting forth plaintiffs'—and defendants'—rights and obligations in litigating intellectual property issues and other civil law rights.  The system in some respects resembles that of the United States, and in other features more closely resembles the civil law systems of continental Europe (and the Asian systems based on them), and also includes some distinctively Chinese features.

45.     In an intellectual property case, as in other civil litigation in a Chinese court, a case begins with the filing of a complaint with the court by the plaintiff.[37] The Chinese court must then determine (ordinarily within a week) whether the complaint satisfies the requirements for the court's acceptance of the case (which entails a review of the adequacy of the complaint and issues akin to subject matter

---

[36] General Principles, arts. 8, 134-150; Civil Procedure Law arts. 5, 18, 259-264; *see also* Supreme People's Court, Interpretation Concerning Application of the Civil Procedure Law, arts. 522 et seq (2015) ("Civil Procedure Interpretation").
[37]  Civil Procedure Law, arts. 119-121; *see also* Copyright Interpretation, art. 1.

jurisdiction, personal jurisdiction, venue, etc.).[38]  Where the bases for jurisdiction are established, or the defendants do not challenge the court's jurisdiction, a court may accept the case.  The court is to issue a notice that the case has been accepted within five days after accepting the case.[39]  As this suggests, courts—not plaintiffs—serve complaints on defendants.  A defendant ordinarily has fifteen days after receiving the complaint and the notice from the court, to file its response or statement of defense.  (For foreign defendants with no domicile in the PRC, this period is extended to thirty days.)  Parties have at least thirty days from the receipt of the notice of the claim to gather and submit evidence and the court has authority to grant extensions when a party encounters "genuine difficulty."[40]

46.     A case is assigned typically to a three-judge panel.[41]  Like other non-common law systems (including democratic, rule-of-law states in Europe and East Asia), China does not use a jury system in civil cases.  The panel of judges is drawn from the relevant subject matter-specialized chamber of the court (in an intellectual property case, an intellectual property tribunal or chamber or, in courts that do not have such a chamber, a civil law chamber).  PRC law directs the court to decide the case impartially, according to law, on the basis of the facts presented and without interference from any "administrative organ, social organization or individual."[42]

47.     There are differences between the procedures of adjudication, including methods for obtaining, introducing, and handling evidence, the discovery process, and adjudication at trial  under PRC law that differ from those under U.S.

---

[38]  Civil Procedure Law, arts. 123, 126.

[39]  Civil Procedure Law, arts. 5, 84-85, 125, 268.

[40] Supreme People Court, Several Provisions on Evidence in Civil Litigation, arts. 32-36 (2008), 49-55 (2019) ("Evidence Provisions"); Civil Procedure Interpretation, art. 111.  The Evidence Provisions were revised, with the amendments to take effect in May 2020.  For clarity and completeness, citations in this declaration are to both versions.

[41] Civil Procedure Law, art. 39.

[42] *See* Civil Procedure Law, arts. 6-8, 43-44, 142.

law, and these differences largely reflect structural variances between civil law and common law legal systems.  As is characteristic of civil law systems, adjudication in China involves a more central or directive role for the court (and a lesser role for the parties and their counsel) in acquiring and examining evidence and other aspects of trial than is typical in the American or common law-style adversarial system (although recent reforms in China have begun to move more toward an adversarial system).[43]

48.     Discovery and the litigation process more generally are more court-dependent and court-driven and less party-driven and party-controlled than in the U.S. and other common law systems.[44]  Much of the negotiation and settlement discussion that occurs long before trial among the parties with little or no court involvement in the U.S. takes place under court supervision and with potentially high levels of court involvement in the PRC.[45]  Adjudication in China, as in civil law systems traditionally, depends relatively more on documentary evidence (including notarized statements) and relatively less on in-person testimony and cross-examination than is typically the case in common law jurisdictions.  Evidence submitted to a court in China generally is not—and is not required to be—provided

_____

[43] Some of these reforms were effected through the Evidence Provisions. Some are reflected in amendments to the Civil Procedure Law.  *See also* Wei Luo, The Civil Procedure Law and Court Rules of the People's Republic of China (2006).

[44] *See* Civil Procedure Law, arts. 63-81 (roles of parties and court in acquiring, verifying, and admitting evidence); *see generally* Mo Zhang and Paul J. Zwier, "Burden of Proof: Developments in Modern Chinese Evidence Rules," 10 Tulsa J. Comp. & Int'l L. 419 (2002-2003); Margaret Y.K. Woo and Yaxin Wang, "Civil Justice in China: An Empirical Study of Courts in Three Provinces," 53 Am. J. Comp. L. 911 (2005).

[45] *See also* Civil Procedure Law, arts. 93-99 (concerning court-supervised mediation, a process that typically precedes adjudication and the authority of the court to require parties and non-parties to cooperate).

- 23 -

1   directly by one party to the opposing party.  Submission to the court by one party

2   and access through the court by the opposing party is the usual method.[46]

3       49.    Chinese laws and courts impose obligations on parties and witnesses to

4   provide, and offer means for acquiring, relevant evidence.[47]  The Civil Procedure

5   Law gives parties the rights to "collect and provide evidence," to "consult material

6   relevant to their case," and to "copy relevant material and legal documents."[48]

7   Parties and non-parties have a legal duty to provide testimonial evidence and to

8   comply with court orders to provide evidence of any type.[49]  If a party is unable

9   "for objective reasons" to obtain evidence, it may seek the court's assistance and

10  the court "shall collect and examine" such evidence.[50]  The Civil Procedure Law

11  gives the court power to order the production of such evidence on its own initiative

12  from parties and non-parties.[51]  The court also may, on its own initiative or at the

13  request of a party, order measures (including seizure or copying of evidence) to

14  preserve evidence that is at risk of being lost, stolen, destroyed, or difficult to obtain

15  at a later date.[52]  The court also may appoint investigators to acquire evidence from

16  parties and non-parties.[53]  Courts have the legal authority to punish failure to

17  comply with obligations to provide or assist in the provision of evidence.[54]

18      50.    Parties have rights to question witnesses and challenge evidence (as

19  well as to present evidence).[55]  Chinese court decisions that I have reviewed

20  _____

21  [46] *See* Civil Procedure Law, art. 49.

22  [47] On the issues concerning evidence in litigation discussed here, *see generally*
    Civil Procedure Law, ch. 6; Evidence Provisions; Civil Procedure Law

23  Interpretation, arts. 90-124.

24  [48] Civil Procedure Law, art. 49.
    [49] Civil Procedure Law, arts. 65, 67, 72, 73.

25  [50] Civil Procedure Law, art. 64.
    [51] Civil Procedure Law, arts. 64, 67.

26  [52] Civil Procedure Law, art. 81.

27  [53] Civil Procedure Law, arts. 64, 67.
    [54] Civil Procedure Law, arts. 114-117.

28  [55] Civil Procedure Law, arts. 68, 139; Evidence Provisions, arts. 47-61 (2008), 60-

- 24 -

routinely include extensive recitations of evidence that the courts have received, parties' assessments and cross-examination of such evidence, and the court's evaluation of such evidence and the reasoned application of the law to such evidence.  Chinese law directs that evidence shall be subjected to cross-examination, and evidence (including testimony) not available for cross-examination is not to be taken as determinative.[56]  Chinese law also provides for the introduction of evidence from expert witnesses.

51.     The Civil Procedure Law further directs Chinese courts to seek the cooperation of foreign courts in collecting evidence wherever treaties to which the PRC is a party or principles of reciprocity so permit.[57]  China is also a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention"), which provides means for China's cooperation with other member states (including the United States) in taking or compelling the production of evidence abroad for use in judicial proceedings in China.[58]  China is also a party to the Hague Convention on Service of Judicial and Extra-Judicial Documents ("Hague Service Convention") which provides means for bringing foreign parties and evidence before Chinese courts.

52.     The plaintiff generally bears the burden of proving her, his, or its case. The Civil Procedure Law imposes a general requirement on parties to provide evidence in support of their claims.  The Supreme People's Court's Provisions on Evidence in Civil Litigation and Chinese law more generally assign the burden of proof to the party making a claim—principally the plaintiff in making its claim (as

---

84 (2019).

[56] Civil Procedure Law, art, 68; Civil Procedure Law Interpretation, art. 103; Evidence Provisions, arts.  47, 55 (2008), 60, 68 (2019).

[57] Civil Procedure Law, art. 276.  Evidence Provisions, art. 11 (2008), 16 (2019), also provides means for receiving evidence produced abroad and introducing it in civil litigation in Chinese courts.

[58] Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, arts. 1-15. *See also* Evidence Provisions, art. 11 (2008), 16 (2019).

- 25 -

1   well as the defendant raising what may fairly be described as affirmative defenses).

2   The Provisions on Evidence in Civil Litigation and Chinese law more generally

3   provide for shifting of the burden of proof in specific circumstances as set forth in

4   relevant laws or where principles of fairness, good faith, and ability to produce

5   evidence so require.[59]

6       53.   Chinese law and practice provide several means for reviewing or

7   overseeing the work of the trial panel.  Every Chinese court has an adjudication

8   committee, generally headed by the president of the court and including the vice

9   presidents of the court, heads of each of the divisions of the court and other senior

10  members of the court.  Its mandate is to review major, complex, and difficult cases

11  being handled at the court, including for errors of fact or law.  The adjudication

12  committee thus imposes formal limits on the autonomy of individual panels of

13  judges (or a single judge), but it remains an organ within the court.

14      54.   Chinese civil procedure law provides other means that promotes

15  judgments consistent with law.  Where the president of the adjudicating court finds

16  certain serious procedural, evidentiary, or legal errors in a judgment, the court can

17  overturn an initial panel's final judgment and order a retrial of the case.[60]

18      55.   Chinese courts facing difficult cases sometimes send requests for

19  authoritative interpretations of the applicable law to the Supreme People's Court,

20  which issues binding "Replies."  This legally authorized process, which a party's

21  request to the trial court can trigger, is loosely analogous to a federal court's

22  certifying a question to a state Supreme Court in the U.S., but in the context of a

23  clearly superior-subordinate relationship between the replying and requesting

24  courts.  The Supreme People's Court also has issued a number of regulation-like

25  statutory "Interpretations" and "Rules" and kindred documents—including in the

26  —————————————

27  [59] Civil Procedure Law, art. 64, 170; *see also* Evidence Provisions, arts. 1-4, 7 (2008).

28  [60] Civil Procedure Law, art. 198.

- 26 -

fields of intellectual property, torts, civil law, and civil procedure—that constitute authoritative and binding sources of law that the lower courts must follow.  These are somewhat akin both to the U.S. Supreme Court's role in establishing rules for the federal courts and to agencies issuing rules interpreting and implementing statutes.

56.     Also, lower courts have been known to seek—with unknown frequency—informal guidance on pending cases from the higher courts that could later review their final decisions. Judiciaries in civil law countries, including Japan and Europe, look a good deal more "ministry-like" or "bureaucratic" in structure and institutional culture—and thus more like China's—than do their U.S. counterparts.  Top-level courts issuing interpretations that make binding law for lower courts without concrete cases or controversies, and systems of legislative supremacy (rather than a fully and formally coequal judicial branch), are hardly unique to China.  They are found in Western Europe, East Asia, and elsewhere.

57.     An adjudicating court's decision can be appealed in China.  In China, the appeal leads to extensive review, in effect a trial *de novo* or, in the apt phrase used in Chinese law, a "trial in the second instance."[61]  Successful appeal rates have been lower in intellectual property cases than in civil cases as a whole—a pattern that likely reflects the higher quality of the courts in which a large share of intellectual property cases is litigated.[62]  After a judgment has become final, the Civil Procedure Law also allows a party to petition a higher level court to seek, and permits a higher level court to order on its own initiative, review and retrial of a case where serious procedural, evidentiary, or legal errors are found.[63]

---

[61] Civil Procedure Law, arts. 40, 164-176, Civil Procedure Law Interpretation, ch. 16.

[62] *See, e.g.,* Supreme People's Court, Intellectual Property Protection by Chinese Courts in 2009 and Supreme People's Court, Intellectual Property Protection by Chinese Courts in 2017 (reporting 5% reversal rate in IPR cases on appeal).

[63] Civil Procedure Law, arts. 198-207; Civil Procedure Law Interpretation, ch. 18.

58.     Chinese law provides that courts also may be subject to "adjudication supervision"—which includes review of decisions in specific cases—by the legislature at the court's level.  Chinese law also allows for procurators—an office that combines functions of prosecutor and ombudsman—to initiate reviews of court decisions for some limited types of error.  Such nonjudicial collateral review occurs in only a very small number of cases.[64]

59.     Final judgments (including mediated settlements reached under court supervision) by Chinese courts are enforceable under Chinese law.  Chinese courts have specialized "enforcement chambers" that are charged with the task of enforcing judgments.  The Civil Procedure Law sets forth in detail mechanisms for pursuing, and challenging, enforcement of judgments.[65]

**B.**     **The PRC has made extensive commitments to, and investments in, providing a court system and legal system which rank relatively high in comparative international assessments, and which often have been found "adequate" by U.S. courts in deciding** *forum non conveniens* **motions and analogous issues.**

60.     China has made extensive efforts and achieved significant accomplishments in building a legal and judicial system.  Since the beginning of the Reform Era in 1978, China has placed building a legal system, ruling the country through law, and establishing the "rule of law" high on the political and programmatic agenda.  The Chinese regime has invested vast material resources in building laws, legal institutions, and courts over the last forty years.[66]  Laws have

---

[64] Civil Procedure Law, arts. 208-213.

[65] Civil Procedure Law, arts. 224-258; Civil Procedure Law Interpretation, ch. 21.

[66] *See generally* Jacques deLisle, "China's Legal System" *Politics in China*, 237-273 (William A. Joseph 3d ed. 2019); Jacques deLisle, "Chasing the God of Wealth while Evading the Goddess of Democracy: Development, Democracy and Law in Reform-Era China," *Democracy and Development: New Perspectives on an Old Debate* 252-293 (Sunder Ramaswamy and Jeffrey Cason, eds. 2003); Randall

1  been adopted and revised, and legal institutions created and transformed, to reflect

2  China's rapid development and change, and to bring China more into line with

3  international norms and requirements (including those relating to intellectual

4  property and demanded by China's WTO and other treaty commitments).

5      61.    Each year around ten million complainants—both Chinese and

6  foreigners—use the Chinese judiciary for redress, seeking and obtaining resolution

7  of their civil claims in Chinese courts.  Intellectual property cases comprise a

8  rapidly growing share of these cases—now nearly 300,000 per year.[67]  During the

9  last five years, Chinese courts have averaged more than 10,000 judgments per year

10  in copyright infringement cases.[68]

11      62.    The civil litigation rate (measured in terms of cases filed with courts

12  on a per capita basis), although far below the U.S.'s internationally exceptionally

13  high rates, is close to one-half that of Canada, Australia, and Japan, and twice that

14  of Finland.  China's litigation rate is this high despite China's much lower per

15  capita income and per capita number of lawyers—factors that correlate positively

16  with civil litigation rates.[69]

_____

Peerenboom, *China's Long March toward the Rule of Law*, chs. 3, 6, 7 (2002);
Randall Peerenboom, *China Modernizes*, chs. 1, 2, 6 (2008); Ann Seidman, Robert
B. Seidman and Janice Payne, *Legislative Drafting for Market Reform: Some
Lessons from China* (1997).  For an overview of lawmaking patterns, *see* Zhu
Jingwen and Han Dayuan, eds. *Research Report on the Socialist Legal System with
Chinese Characteristics*, vol. 1 (Singapore: Enrich, 2013).

[67] "Chinese Courts Tried 288,000 Intellectual Property Cases in 2018, Mar. 12,
2019 (summarizing Supreme People's Court Work Report to National People's
Congress) https://www.efe.com/efe/english/world/chinese-courts-tried-288-000-
intellectual-property-cases-in-2018/50000262-3921816

[68] This is based on statistics from the authoritative "China Judgements Online"
database, https://wenshu.court.gov.cn/.

[69] On these issues, *see* J. Mark Ramseyer and Eric B. Rasmusen, "Comparative
Litigation Rates," Harvard John M. Olin Center for Law, Economics and Business
Discussion Paper No. 681, Nov. 2011; G. Palumbo et al. "The Economics of Civil
Justice: New Cross-Country Data and Empirics," OECD Economics Department
Working Papers No. 1060 (2013); Theodore Eisenberg, Nick Robinson and Sital

- 29 -

1      63.    China receives comparatively high marks in the prominent and widely

2  cited World Bank "Rule of Law" index.  In the most recent ratings, China scores at

3  the 45th percentile globally, not far below the international median.  China ranks

4  around the median for countries in its "upper middle income" group (which, as a

5  whole, are at the 48th percentile globally), commensurate with its per capita income

6  ranking at slightly above the upper middle income country average.[70]  The World

7  Bank Index derives its measurements from the "perceptions of the extent to which

8  agents have confidence in and abide by the rules of society" including the

9  perceptions of "individuals or domestic firms with first-hand knowledge," "country

10  analysts at the major multilateral development agencies" with "in-depth

11  experience," and others with "extensive experience in the countries they are

12  rating."[71]

13      64.    The World Bank's rankings are a composite of measures of different

14  aspects of the rule of law.  China fares far better with sources that are more relevant

15  to law related to the economy, commercial matters, civil law, and "political risk."[72]

16

17  _____

18  Kalantry, "Litigation as a Measure of Well-Being," 62 DePaul Law Review 247
   (2013); Tom Ginsburg and Glenn Hoetker, "The Unreluctant Litigant: An
19  Empirical Analysis of Japan's Turn to Litigation," 35 Journal of Legal Studies 31
   (2006); Juan S. Mora Sanguinetti and Nuno Garoupa, "Do Lawyers Induce
20  Litigation? Evidence from Spain, 2001-2010," International Review of Law and
   Economics, vol. 44 (2015): 29-41.
21  [70] *World Bank, Worldwide Governance Indicators*, available at
22  http://info.worldbank.org/governance/wgi
   [71] Daniel Kaufmann, Aart Kraay and Massimo Mastruzzi, *The Worldwide*
23  *Governance Indicators: Methodology and Analytical Issues*, 6-9, 20 (Sept. 2010),
24  available at http://ssrn.com/abstract=1682130.
   [72] *See Worldwide Governance Indicators - Country Data Report for China 1996-*
25  *2014*, available at
26  http://documents.worldbank.org/curated/en/794961468198529176/pdf/105428-WP-
   PUBLIC-China.pdf (summarizing China's scores / rankings on the component
27  elements or sources of the World Bank's "rule of law" index, with links to those
28  underlying sources).

- 30 -

65.     United States courts on many occasions have found China to provide an available and adequate forum for the resolution of civil disputes in the context of ruling on *forum non conveniens* motions seeking dismissal lawsuits in favor of transfer to Chinese courts.[73]   Several of the cases in which U.S. courts have found

---

[73] *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 435 (2007) (District Court granted *forum non conveniens* motion and had dismissed to China; Supreme Court reversed Third Circuit reversal of District Court, describing the case as "a textbook case for immediate *forum non conveniens* dismissal" and noting the District Court's "well-considered *forum non conveniens* appraisal"); *Feng Zhen Lu v. Air China Int'l Corp.*, No. CV 92-1254, 1992 WL 453646, at \*1-2 (E.D.N.Y. Dec. 16, 1992) (granting *forum non conveniens* motion, finding "[i]t plainly appears that China is an adequate forum" despite plaintiff's "claim that Chinese courts will favor Air China because of the government's financial interest in that entity"); *China Gezhouba United Indus. v. Robinson Helicopter Co.*, No. YC022805 (Cal. Super. Ct. Oct. 18, 1995), *aff'd* No. B098870 (Cal. Ct. App. July 7, 1997) (finding China to provide an adequate forum and granting *forum non conveniens* motion); *Marshall Commodities Ltd. v. People's Ins. Co. of China*, No. 94 CIV. 9061 LMM, 1996 WL 684219 (S.D.N.Y. 1996) (noting that parties accepted that China provided adequate forum but denying *forum non conveniens* motion on basis of private and public interest factors); *S. Megga Telecommc'ns. Ltd. v. Lucent Techs., Inc.*, No. 96-357-SLR, 1997 WL 86413 (D. Del. Feb. 14, 1997) (granting *forum non conveniens* motion made by a non-Chinese party in case where opposing party was relatively closely linked to the Chinese state—a joint venture partly owned by "a Chinese government corporation" and "a wholly-owned subsidiary of . . .an agency of the Chinese government"); *China Tire Holdings Ltd. v. Goodyear Tire & Rubber Co.*, 91 F. Supp. 2d 1106, 1111 n.4 (N.D. Ohio 2000) and *Orion Tire Corp. v. Goodyear Tire & Rubber Co.*, 268 F.3d 1133, 1139 (9th Cir. 2001) (lower court in *Orion Tire* granted *forum non conveniens* motion; appellate court vacated lower court's decision but stated that, given the basis of its ruling, "it would be inappropriate for us to review at this juncture . . . *forum non conveniens* issues"; *China Tire Holdings* court dismissed the case before it on claim preclusion grounds but stated it "would adopt the [*Orion Tire*] district court's reasoning and independently dismiss the plaintiff's claims on the ground of *forum non conveniens*"); *In re Compania Naviera Joanna S.A.*, 531 F. Supp. 2d 680 (D.S.C. 2007) (finding that China provided an "adequate" forum and granting *forum non conveniens* motion made by a non-Chinese party in case where opposing party was relatively closely linked to the Chinese state); *S&D Trading Academy v. AAFIS*, 494 F. Supp. 2d 558, 571 (S.D. Tex. 2007) (finding China to provide adequate alternative forum; rejecting *forum non conveniens* motion on basis of private and

- 31 -

1

_____

2   public interest factors); *2002 Irrevocable Tr. for Richard C. Hvizdak v. Huntington*

3   *Nat'l Bank*, No. 2:08-CV-556-FtM-99DNF, 2008 WL 5110778, at *6 (M.D. Fla.
    Dec. 1, 2008) (finding that "China is an adequate forum" and that "both the

4   [defendant's expert's] affidavit" and "the case law are sufficient to establish" the

5   "fairness of Chinese courts" as required for granting a *forum non conveniens*

6   motion, but denying the motion based on assessment of private and public interest
    factors); *Zhang Guimei v. General Electric*, No. B201016 (Cal. Ct. App. Feb. 26,

7   2009) (affirming trial court finding that China provides an adequate forum and

8   granting *forum non conveniens* motion, even in a case where moving parties
    included a large state-linked airline; trial court found that plaintiffs' evidence

9   contesting adequacy of a Chinese forum "pales compared to the strong evidence
    that Plaintiffs will receive fundamental justice in China"); *Group Danone v. Zhong*,

10  No. BC372121 (Cal. Super. Ct. Feb. 27, 2009) at 26 (finding China to provide a

11  "suitable" forum and granting, in part, defendants' *forum non conveniens* motion
    despite plaintiffs' expert's claim that, given defendants' affiliate's "prominence and

12  links to the Chinese Communist Party (CCP), the national government and local

13  government, and given the current state of the Chinese judiciary, there is a real and
    significant danger that powerful extrajudicial influence will be exerted on any

14  Chinese court" adjudicating a case involving defendants and a foreign plaintiff);

15  *CYBERsitter v. China*, No. CV-10-38-JST (SHx), 2010 WL 4909958, at *4-5 (C.D.
    Cal. Nov. 18, 2010) (stating that "[plaintiff's expert's] declaration, and therefore

16  [plaintiff's] concerns are speculative and fail to convince the Court that China

17  would not provide an adequate alternative forum" in a case involving a PRC state
    defendant; denying *forum non conveniens* motion on basis of assessment of public

18  and private interest factors); *Huang v. Advanced Battery Techs., Inc.*, No. 09 CV

19  8297(HB), 2010 WL 2143669 (S.D.N.Y. May 26, 2010) (granting *forum non*

20  *conveniens* motion and finding China to provide an adequate forum; noting court's
    decision might have been different "if this were a civil liberties lawsuit rather than a

21  contract case"); *Huang v. Advanced Battery Techs.*, No. 09 CV 8297(HB), 2011

22  WL 813600 (S.D.N.Y. Mar. 8, 2011) (finding plaintiff failed to take steps available
    under Chinese law that likely would have led to Chinese court's acceptance of his

23  case, and rejecting plaintiff's plea to reinstate the case after Chinese court declined

24  to accept the case); *Tang v. Synutra Int'l, Inc.*, Civil Action No. DKC 09-0088,
    2010 WL 1375373, at **6, 10 (D. Md. Mar. 29, 2010), *aff'd* 656 F.3d 242, 251 (4th

25  Cir. 2011) (District Court granting *forum non conveniens* motion, finding that

26  Chinese courts were open to plaintiffs and "[e]ven if the Chinese courts were not
    open to Plaintiffs, another remedy is undisputedly available to them, namely, the

27  [state-created] compensation program"; Court of Appeals finding that "evidence
    supports the district court's finding that Plaintiffs may seek a remedy in China's

28  courts if they so elect . . . . [T]he district court did not abuse its discretion by

- 32 -

1

2    finding that China's courts are in fact available to hear Plaintiffs' claims.");

3    *Chattery Int'l, Inc. v. JoLida, Inc.*, Civil No. WDQ-10- 2236, 2012 WL 1454158
     (D. Md. Apr. 24, 2012) (finding China to provide adequate forum; denying *forum*

4    *non conveniens* motion on basis of public and private interest factors); *Innovation*

5    *First Int'l, Inc. v. Zuru, Inc.*, 513 F. App'x. 386 (5th Cir. 2013) (affirming District
     Court's *forum non conveniens* dismissal and finding that China provided adequate

6    forum); *Sullivan v. Starwood Hotels &* Resorts, 949 F. Supp. 2d 324 (D. Mass.

7    2013) (defendant failed to provide evidence that China was an adequate and
     available forum); *Masimo v. Mindray DS USA, Inc.*, No. SACV 12-02206-

8    CJC(JPRx), 2013 WL 12129654 (C.D. Cal. Jul. 17, 2013) (finding China to provide

9    adequate forum; denying *forum non conveniens* motion on basis of public and
     private interest factors); *Nalco Co. v. Chen*, No. 12C9931, 2013 WL 4501425 (N.D.

10   Ill. Aug 22, 2013) (finding China to provide adequate forum; denying *forum non*

11   *conveniens* motion on basis of public and private interest factors); *Jacobs Vehicle*
     *Systems, Inc. v. Yang*, No. 1:12-CV-00181, 2013 WL 4833058 (M.D.N.C. Sept. 10,

12   2013) (finding China to provide adequate forum; denying *forum non conveniens*

13   motion on basis of public and private interest factors); *RF Micro Devices v. Xiang*
     No. 1:12-CV-967, 2013 WL 5462295 (M.D.N.C. Sept. 30, 2013) (defendant failed

14   to provide evidence that China is an adequate and available forum); *Warner Tech.*

15   *& Inv. Corp. v. Hou*, Civil Action No. 13-7415(MAS)(DEA) 2014 WL 7409978
     (D.N.J. Dec. 31, 2014) (finding China to provide an adequate forum and granting

16   *forum non conveniens* dismissal); *In re Montage Technology Group Ltd Securities*

17   *Litigation*, 78 F. Supp. 3d 1215 (N.D. Cal. 2015) (finding China not to be an
     adequate forum because defendant failed to show that Chinese securities laws

18   reached extraterritorial behavior at issue in the case); *Nibrutech Ltd v. Jang*, No. Co

19   14-3091 PJH, 2015 WL 831465 (N.D. Cal. Feb. 23, 2015) (finding China to
     provide an adequate forum and granting *forum non conveniens* dismissal); *Zhao*

20   *and Cui v. Ye,*  No. 3:14-cv-00157-MO, 2015 WL 2170124 (D. Or. May 6, 2015)

21   (finding China to provide an adequate forum, where Chinese court first rejected
     then accepted case filed following court's prior *forum non conveniens* dismissal);

22   *Holzman v. Xin*, No. 12-cv-8405, 2015 WL 5544357 (S.D.N.Y. Sept. 18, 2015)

23   (finding China to provide an adequate forum, citing *CYBERsitter*, and granting
     *forum non* dismissal); *Jiangsu Hongyuan Pharm. Co. v. DI Global Logistics Inc.*,

24   159 F. Supp. 3d 1316 (S.D. Fla. 2016) (finding China to provide an adequate

25   forum, citing *CYBERsitter*, and granting *forum non conveniens* dismissal);
     *Crescendo Maritime Co. v. Bank of Commc'ns*, 15 Civ. 4481 (JFK), 2016 WL

26   750351 (S.D.N.Y. Feb. 22, 2016) (finding China to provide an adequate forum but

27   denying *forum non conveniens* motion on grounds of public and private interest
     factors and deference to plaintiff's choice of forum); *Xiaoguang Zheng v. Soufun*

28   *Holdings*, No. 1:15-CV-1690, 2016 WL 1626951 (N.D. Ohio Apr. 25, 2016) (China

- 33 -

China to provide an adequate alternative forum have involved issues of Chinese intellectual property law.[74] *Forum non conveniens* motions have been granted in several cases despite vigorous opposition and expert testimony from parties opposing *forum non conveniens* motions and in other analogous contexts.[75] United

_____

an adequate forum, granting *forum non conveniens* dismissal), *aff'd* 2017 WL 3708628 (6th Cir. May 18, 2017); *Spencer Stuart Human Resources Consultancy v. American Industrial Acquisition Corporation*, 2017 WL 4570791 (S.D.N.Y. Oct. 12, 2017) (conditionally granting *forum non conveniens* motion where plaintiff "does not contend that China is an inadequate alternative forum"); *Melaleuca v. Kot Nam Shan*, 2018 WL 1952523 (D. Idaho Apr. 24, 2018) (finding China to provide adequate alternative forum where plaintiff had not shown that Chinese law did not provide a possible for basis of recovery despite absence of specific tort of tortious interference with contract and where plaintiff had submitted itself to jurisdiction of Chinese court); *Wang v. General Motors and GM (China) Investment Co.*, 371 F.Supp.3d 407 (E.D. Mich. 2019) (denying *forum non conveniens* motion where defendant's argument that China was available and adequate forum was that Chinese courts "can and do apply foreign law," and defendant did not assert it was amenable to process in China); *Sund v. Marriott International, Inc.*, 2020 WL 2085469 (D. Md. Apr. 30, 2020) (finding China to provide an adequate forum given availability of broadly similar tort law claims and despite differences from U.S. law in judicial process, recoverable types of damages, but denying *forum non conveniens* motion on public and private interest factors); *Tongfang Global Ltd. v. Element Television Co.*, 2020 WL 4354173 (C.D. Cal. June 22, 2020) (granting *forum non conveniens* motion on antitrust counterclaims, where relevant conduct, parties, and applicable law were Chinese).

[74] *See, e.g.*, *S&D Trading, Group Danone, CYBERsitter, Chattery Int'l,* and *Innovation First.*

[75] Cases in which U.S. courts have denied *forum non conveniens* motions seeking dismissal to China have almost always done so not on the basis that China does not provide an available and adequate alternative forum, but, rather, on the basis of private and public interest factors, which can vary significantly across cases and where courts appear to exercise considerably greater discretion. Cases in which U.S. courts have denied *forum non conveniens* motions seeking dismissal to China on adequate forum grounds almost always base their decision not on an affirmative determination that China does not provide an adequate and available forum but, rather, on the moving party's failure to introduce adequate evidence, or any evidence that China provides such a forum.

    I am aware of only a handful of cases in which a U.S. court has affirmatively found China not to provide an adequate alternative forum despite the moving

- 34 -

States courts also have given effect or accorded comity, to final judgments from Chinese courts, applying legal standards analogous to those applied in the context of *forum non conveniens* cases.[76]

_____

party's having contested the issue and offered much evidence about the quality of Chinese courts and adjudication. One of those findings was based not on the general inadequacy of Chinese courts or their failure to provide fair justice but, rather, on Chinese law perhaps not providing a remedy for plaintiff's alleged harms because plaintiff's claims were based on activities outside of China and thus might be beyond the reach of relevant Chinese securities laws (which, like most Chinese regulatory laws, did not clearly purport to reach extraterritorially)—a concern not implicated here. *In re Montage Technology Group Ltd. Securities Litigation*, 78 F.Supp.3d 1215 (N.D. Cal. 2015).  The other two cases found, China not to be an adequate forum because: Chinese law did not provide for causes of action equivalent to or identical to each and every one of plaintiff's claim—a holding seemingly sharply at odds with well-established *forum non conveniens* law, including *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) and many of the cases cited *supra* in which China was found to provide an adequate alternative forum; some Chinese courts would lack jurisdiction to adjudicate claims against principal defendants; and because (in the court's assessment) Chinese evidence law would require the production of evidence in forms that the plaintiff could not produce. *See BP Chemicals Ltd. v. Jiangsu SOPO Corp.* 429 F.Supp.2d 1179 (E.D. Mo. 2006); *Beijing iQIYI Science and Technology Co. v. iTalk Global Communications, Inc.*, 2019 WL 6876493 (W.D. Tex. Dec. 17, 2019).

[76] *Hubei Gezhouba Sanlian Indus. Co. v. Robinson Helicopter Co.*, No. 2:06-cv-01798-FMC-SSx, 2009 WL 2190187, at *6 (C.D. Cal. 2009), *aff'd* 425 F. App'x 580, 2011 WL 1130451 (9th Cir. 2011) (defendant had not shown "that the PRC court system is one which does not provide impartial tribunals or procedures compatible with the requirements of due process of law"); *Global Material Technologies v. Dazheng Metal Fibre Co.*, 2015 WL 1977527 (N.D. Ill. 2015) (enforcing Chinese court judgment where party opposing judgment "does not allege that the Chinese judicial system as a whole is biased and incompatible with principles of basic fairness," and rejecting "'retail' inspection" of "how exactly the Chinese court approached" the case);  *Folex Golf Indus. v. China Shipbuilding Indus. Corp.*, No. CV09-2248-R, 2013 WL 1953628, at *4 (C.D. Cal. 2013), *rev'd on other grounds Folex Golf Indus. v. O-TA Precision Indus.*, 603 F. App'x. 576 (9th Cir. 2015) (noting "U.S. courts consistently acknowledge the adequacy of due process in the PRC judicial system").

- 35 -

## C. Courts that would likely adjudicate Plaintiffs' claims are of comparatively high quality.

66.     If Plaintiffs' claims were adjudicated in China, they would fall into the category of intellectual property cases and likely would be adjudicated in a court—and, specifically, an intellectual property court or internet court—in Beijing or, perhaps, Guangzhou.  These characteristics mean that the claims would be adjudicated by an especially high-quality Chinese tribunal.

67.      Chinese law provides that the people's court in the jurisdiction where the tort occurs (*qinquan xingwei di*) or the jurisdiction of the defendant's domicile—in the case of a legal person, its principal place of business or the location of its principal business office.[77]  Where the proper defendants are Chinese parties, these issues often are relatively straightforward, although (as noted in the discussion of choice of law issues earlier) the location of a tortious act can be complicated in cases of copyright infringement, especially with a transnational element.  Where the proper defendants are or include foreign parties that are not domiciled in China, a Chinese court still can be an appropriate forum under Chinese law.  Chinese civil procedure law provides for jurisdiction of a Chinese court where the subject matter of the lawsuit is located, where the defendant has any distrainable property, where the defendant has a representative office, or (provided that the subject matter of the lawsuit, defendant's distrainable property, or defendant's representative office is in Chinese territory) where the tort occurs (*qinquan xingwei di*).[78]

---

[77] Under Chinese law, courts in more than one jurisdiction may have authority to adjudicate a case.

[78] Civil Procedure Law, arts. 21, 28 (court in place of infringing act in tort case or defendant's domicile has jurisdiction), art. 265 (jurisdiction in tort cases involving foreign parties without domicile in China); Civil Procedure Law Interpretation, arts. 3 (domicile of legal person), 24 (place of tort means place of tortious act or place of consequence/injury).

68.     Special rules concerning jurisdiction over copyright cases are similar. The Supreme People's Court's Copyright Interpretation provides that infringement cases are under the jurisdiction of the court where the infringing act occurred (*qinquan xingwei shishi di*) (or where reproductions were located), or in the jurisdiction where the defendant is domiciled (*beigao zhusuo di*).  Where a plaintiff sues two or more defendants and the defendants' infringing acts occurred in different jurisdictions, the plaintiff may choose among those jurisdictions.[79]

69.     Special rules concerning jurisdiction in cases of copyright infringement over the internet are similar as well.  The Supreme People's Court Information Networks Provisions direct that a case involving infringement of the right of dissemination of a copyrighted work over information networks is under the jurisdiction of the court of the place where the infringement occurs (*qinquan xingwei di*) or the defendant's domicile (*beigao zhusuo di*).  The place where the infringement occurs is defined as the location of the relevant network server, or any equipment used for infringement.[80]

70.     Because it is a copyright civil case and because it is a case involving a foreign party, Plaintiffs' claims would be heard by an intermediate (or higher)—rather than a basic—level court.[81]

71.     Beijing's and Guangzhou's courts are widely acknowledged to be among the best courts in China.[82]  Beijing and Guangzhou are among China's wealthiest and most economically developed areas (with per capita incomes surpassing $23,000).  Both cities are rated in Chinese assessments as solidly top tier commercial cities (ranking second and third nationally).[83]

---

[79] Copyright Interpretation, arts. 4-5; Civil Procedure Law, arts. 18,
[80] Information Networks Provisions, art. 15.
[81] Civil Procedure Law, art. 18; Copyright Interpretation, art. 2.
[82] Jacques deLisle, "Traps, Gaps and Law: Prospects and Challenges for China's Reforms" in Is China Trapped in Transition?10-3 (Randall Peerenboom, ed. 2007).
[83] "Forbes China's Best 100 Cities for Business List (Full Ranking), Jan. 2, 2018,

- 37 -

72.     It is widely accepted by participants and observers that courts in more developed regions, such as Beijing and Guangzhou, generally provide fairer and higher quality justice to litigants.  Studies that focus on litigation in Shanghai—one of China's most economically developed and legally sophisticated jurisdictions, and in these respects similar to Beijing and Guangzhou—find (comparatively and, often, absolutely) low rates of attempts, or successful attempts, to influence outcomes improperly, and high levels of court competence and litigant satisfaction with the fairness of the outcomes in civil cases.[84]  Studies of litigant perception and satisfaction, and court performance show levels in more economically advanced areas that are much higher than national averages.[85]

---

https://www.forbes.com/sites/russellflannery/2018/01/02/forbes-chinas-best-100-cities-for-business-list-full-ranking/#323a51066328; Yicai Global, "The Best Chinese Cities," May 25, 2017, https://www.yicaiglobal.com/news/best-chinese-cities-ranking-most-commercially-charming-chinese-cities-2017

[84] Mei Ying Gechlik, "Judicial Reform in China: Lessons from Shanghai," Carnegie Endowment for International Peace (2015), https://carnegieendowment.org/2005/04/15/judicial-reform-in-china-lessons-from-shanghai-pub-16784 (attempt to influence court outcome improperly occurs at rates under 1%); Minxin Pei, Guoyan Zhang, Fei Pei, and Lixin Chen, "A Survey of Commercial Litigation in Shanghai" in Judicial Independence in China (Randall Peerenboom, ed. 2009) (large majority of winning parties, although minority of losing parties, believe the outcome was consistent with the facts and the law and did not reflect improper influence); Minxin Pei, Zhang Guoyan, Pei Fei and Chen Lixin, China's Evolving Legal System, Carnegie Endowment for Int'l Peace (Feb. 2009), http://www.carnegieendowment.org/files/China_Legal_System_Full_Text2.pdf ("[a]t least in Shanghai, the system is far from perfect, yet the majority of litigants are satisfied to have a legal recourse that may help resolve commercial disputes and protect their legitimate rights" and "only 8% of litigants who lose their case thought that it was due to preferential treatment").

[85] Xin He, "The Recent Decline in Economic Caseloads in Chinese Courts," 191 China Q. 352 (2007) (contrasting high levels of judicial competence and litigant satisfaction in two local courts in developed, affluent coastal region and much lower levels in a mixed agricultural-industrial, poor, inland region); Woo and Wang, "Civil Justice in China" (similar); Ethan Michelson and Benjamin L. Read, "Public Attitudes Toward Official Justice in Beijing and Rural China," in Chinese

- 38 -

73.     Several factors are recognized as contributing to this pattern.  Judges in more developed areas generally are better educated, have more experience in legal and judicial work, enjoy higher prestige, and operate in a more sophisticated professional legal environment—both within their courts and among peers at law firms, government entities, and companies in the same locality. Educational credentials (including field of specialty and quality of institution) are important factors in hiring for desirable judicial jobs such as those on courts in more developed areas.  Because a disproportionate share of judges in a jurisdiction are likely to have graduated from local universities or to have moved from elite universities to opportunities in large affluent coastal cities, judges in Beijing and similar places are more likely to have graduated from some of China's stronger institutions of higher learning and legal education.   Competence, status, and sense of professional role and identity are plausibly associated with higher quality justice and stiffer resistance to influence producing legally improper outcomes.  Recent research has found that more professional skills-based, or meritocratic, judiciaries are located in parts of China where judges have stronger options to leave the court for high-paying positions at private firms (as is typically the case in richer, more developed cities).[86]

74.     Beijing and Guangdong (the province of which Guangzhou is the capital and principal city) are two of the five provincial-level jurisdictions in China

_____

Justice: Civil Dispute Resolution in Contemporary China (Margaret Y.K. Woo and Mary E. Gallagher, eds. 2011) ("experiences with the courts were assessed far more negatively in rural China than in Beijing."); C. Fred Bergsten, Bates Gill, Nicholas R. Lardy and Derek J. Mitchell, China: The Balance Sheet 69 (2006) (quality of judicial personnel outside major cities remains uneven); Peerenboom, China Modernizes 199 ("On the whole, courts in the more developed eastern region and in larger cities are more advanced. . . .").

[86] *See* Jonathan J. Kinkel, "High-End Demand: The Legal Profession as a Source of Judicial Selection Reform in Urban China," Law and Social Inquiry, vol. 40, no. 4 (2015): 969-1000.

- 39 -

with the highest number of lawyers per capita.  These five top jurisdictions have nearly twenty times the number of lawyers per capita as do the bottom five.  Per capita earnings for lawyers in different parts of China and the number and scale of offices of China's leading law firms and foreign law firms—which are exceptionally high in Shenzhen and Guangzhou (Guangdong) and far higher there and in similar places than in the country as a whole—underscore that the inequality is qualitative as well as quantitative.[87]  As a result, courts in Guangzhou and Beijing operate in a comparatively rich and advanced legal environment.

75.     Higher level courts generally are accepted as providing among the best and fairest justice in China.  The higher quality of intermediate level courts (compared to basic-level courts) is frequently cited as a reason why Chinese law vests intermediate (or higher-level) courts with original jurisdiction over particularly important categories of cases, including significant cases involving foreign parties and intellectual property cases.  The pattern of higher quality justice in higher level courts has been especially noted in the context of intellectual property-related litigation.[88]

---

[87] Zhu, Jingwen, *China Law Development Report 2012: China Legal Workers' Professionalization* (ed. 2013) (Zhongguo Falu Fazhang Baogao 2012: Zhongguo Falu Gongzuozhe de Zhiyehua).

[88] Donald C. Clarke, "Private Enforcement of Intellectual Property Rights in China," *NBR Analysis*, vol. 10, no. 2, 38 (Apr. 1999) ("[T]he higher up in the court hierarchy a plaintiff with a meritorious case can start, the better his chances"); Zhong Jianhua and Yu Guanghua, "Establishing Truth from Facts: Has the Chinese Civil Process Achieved this Goal?" 13 *J. Transnat'l L. & Pol'y* 393, 418 (2003-2004) (assignment of jurisdiction over major cases involving foreigners exclusively to high people's courts and to intermediate courts in China's most developed areas reflects regime conclusion that the quality of basic level court judges and intermediate court judges elsewhere is lower); Cohen, 45 *Am. J. Comp. L.* at 801 ("'[C]onnections'" are "less likely" to affect the outcome of a case where foreign litigants are involved, because the PRC government, in order to encourage foreign trade and investment, wishes PRC courts to develop a reputation for reliability. . . ."); Randall Peerenboom, *China Modernizes* 199 (2007) (basic-level courts as major source of the "problems of judicial corruption and competence"); Ryan Ong,

76.     Intellectual property cases are generally considered to be ones in which the quality of adjudication is significantly higher than in civil cases more generally.  Intellectual property tribunals and judges—especially in Beijing, Guangzhou, and other similar jurisdictions—are widely recognized as being especially high-quality.  According to China's Supreme People's Court, the "general practice" is to assign "better and more experienced" judges to intellectual property case work and to select intellectual property court judges "from the pool of persons well versed in law and foreign language and who possess specialized technical knowledge and good adjudication experience."[89]  The perceived quality of intellectual property tribunals in intermediate and higher courts in the developed areas (such as Beijing and Guangzhou) where foreigners do business was a

_____

"Tackling Intellectual Property Infringement in China," *China Business Review*, Mar.-Apr. 2009 (higher quality judges and adjudication in Beijing; Beijing Number One Intermediate Court "widely viewed as the best in China").

To the considerable extent that fairness in adjudication likely depends on quality and competence of judges, the widespread recognition that there are higher quality judges on higher level courts in richer areas is probative. *See* Cohen, "Reforming China's Civil Procedure," 793, 796 ("As a general matter, the higher the court, the better the qualifications of the judicial personnel" and judges who handle economic cases "tend to have more training, experience and specialized knowledge").

Official programs to address challenges of local protectionism (discussed later in this report) have relied upon the greater probity of higher-level courts.  *See*, *e.g.*, Susan Finder, "The Supreme Court of the People's Republic of China," 7 *J. Chinese L.* 145, 218-219 (1993) (describing experiment to combat local protectionism by giving provincial high courts and provincial people's congresses power to appoint intermediate and lower court judges); Peerenboom, *China's Long March* 326-327 (describing Supreme People's Court efforts against local protectionism in lower-level courts).  One rigorous survey found higher public trust in higher-level courts.  Landry, "Institutional Diffusion of Courts in China" (China-wide survey on trust in courts).

[89] *See, e.g.,* Supreme People's Court, Intellectual Property Protection in Chinese Courts 2009, intro, § 4.1; Supreme People's Court, Intellectual Property Protection in Chinese Courts in 2017, § 2.2.

- 41 -

1    motivation for giving such entities original jurisdiction over significant cases
2    involving foreigners.

3        77.    Among intermediate, and higher-level, courts in China's most
4    developed areas, judges in the intellectual property tribunals on average have
5    especially high educational levels. Intellectual property courts in advanced areas
6    such as Beijing and Guangzhou, have far higher percentages of judges with
7    advanced degrees in law and in technical subjects. The Supreme People's Court's
8    frequent White Papers on judicial protection of intellectual property rights detail
9    and emphasize extensive specialized training and education that intellectual
10   property court judges receive.[90]

11       78.    Recent institutional innovations have further enhanced the status and
12   stature of intellectual property adjudication bodies with the establishment of
13   specialized Intellectual Property Courts in select jurisdictions, with two of the first
14   three being in Beijing and Guangzhou.  These specialized courts are of the same
15   level as intermediate courts (the highest level below provincial high courts, which
16   are one level below the Supreme People's Court).  They are the courts of first
17   instance for some types of intellectual property cases, and are the appellate courts
18   for the full range of intellectual property cases from lower-level civil courts in their
19   geographic jurisdictions.[91]

20       79.    Because the scope of intellectual property divisions'—and the newer
21   intellectual property courts'—jurisdiction is relatively narrow, judges in the
22   intellectual property chambers or courts have comparatively great depth of

23

24   [90] Supreme People's Court, *Intellectual Property Rights Protection by Chinese
25   Courts*, including reports for 2009, 2011, 2012, 2015; *see also* Outline of Judicial
     Protection of Intellectual Property in China (2016-2020).
26   [91] Supreme People's Court, Rules Concerning the Jurisdiction over Cases of the
27   Beijing, Shanghai, and Guangzhou Intellectual Property Courts (2014); National
     People's Congress Standing Committee, Decision on Establishing Intellectual
28   Property Courts in Beijing, Shanghai, and Guangzhou (2014).

- 42 -

1  experience with the laws they are likely to apply in a given case.  Intellectual

2  property court judges also receive extensive and intensive guidance from previously

3  decided cases—much more than do Chinese judges as a whole.  Voluminous

4  posting of cases (including a database with tens of thousands of decisions), rising

5  use of precedent-like cases, and regular issuance of selected model or exemplary

6  cases by the Supreme People's Court are extensive and are more common and more

7  developed in intellectual property than in other fields of law.[92]  The U.S.

8  government has acknowledged and praised such moves.[93]

9        80.  The American academic co-director of a U.S.-China intellectual

10  property institute in China opined that "[t]he very good news is that intellectual

11  property cases" are among the categories most amenable to fair resolution in

12  Chinese courts.[94]  A prominent foreign IP watchdog group recently characterized

---

[92] Notice of the General Office of the Supreme People's Court on Issuing Ten Cases Concerning Judicial Protection of Intellectual Property Rights, Ten Innovative Cases and Fifty Typical Cases Heard by Chinese Courts in 2012; Jiang Huiling and Yang Yi, "Beijing Intellectual Property Court: Innovative Practices in Using Precedents to Guide Adjudication Work," *Legal System Daily* Law Institute, Apr. 7, 2016, available at http://www.ccpit-patent.com.cn/zh-hans/node/3135; Supreme People's Court, Intellectual Property Rights Protection by Chinese Courts (annual); State Intellectual Property Office, Intellectual Property Rights Protection in China § IV (2015) (describing intellectual property court capacity building measures); *see also* Shenping Yang, "Patent Enforcement in China," *Landslide* vol. 4, No. 2 (American Bar Association, 2011) (describing publicization to IP judges of illustrative cases).

[93] U.S.-China Joint Fact Sheet on the 26th U.S.-China Joint Commission on Commerce and Trade, December 2015, available at https://ustr.gov/about-us/policy-offices/press-office/fact-sheets/2015/December/US-China-Joint-Fact-Sheet-26th-JCCT ("The United States welcomes that the Supreme People's Court has established a database for searching intellectual property-related court decisions.").

[94] William O. Hennessey, "Protection of Intellectual Property in China (30 Years and More)," 46 Hous. L. Rev. 1257, 1295 (2009); cf. Naigen Zhang, "Intellectual Property Law Enforcement in China," 8 Fordham Intell. Prop. Media & Ent. L.J. 63 (1997).[95] Jeffrey Langer, "Rapid Changes in the Chinese Legal System, an Increasingly Attractive Venue for IP Litigation," IP Watchdog, May 7, 2018,

China's legal system as offering "a viable venue for all intellectual property enforcement," with intellectual property rights owners winning and receiving injunctive relief (as well as damages) in the vast majority of cases.[95]  Academic studies have found intellectual property litigants—and especially foreign parties in intellectual property litigants—win appeals more often than Chinese parties do and are treated more fairly in litigation than are litigants in Chinese courts generally.[96] A recent data-intensive study found that plaintiffs won 80% of the time in intellectual property cases and (in the region that includes Beijing) received injunctions in 90% of cases in which they prevailed.[97]  Foreign analysts describe the intellectual property division of the Intermediate People's Court in Beijing (a forerunner to the intellectual property court) as "widely viewed as the best in China in terms of experience and expertise" in the field and as attracting a large portion of filings by foreign plaintiffs.[98]

81.   Claims relating to copyright infringement on the internet may also be brought in special Internet Courts that have been established in Beijing and

_____

https://www.ipwatchdog.com/2018/05/07/rapid-changes-chinese-legal-system-attractive-venue-ip-litigation/id=96099/

[95] Jeffrey Langer, "Rapid Changes in the Chinese Legal System, an Increasingly Attractive Venue for IP Litigation," IP Watchdog, May 7, 2018, https://www.ipwatchdog.com/2018/05/07/rapid-changes-chinese-legal-system-attractive-venue-ip-litigation/id=96099/

[96] Mei Y. Gechlik, Protecting Intellectual Property in Chinese Courts: An Analysis of Recent Patent Judgments 15 (Carnegie Endowment for International Peace, January 2007) (foreign plaintiffs prevail at a higher rate (one-third) than do Chinese plaintiffs (one-quarter)); Rongjie Lan, "Are Intellectual Property Litigants Treated Fairer in China's Courts? An Empirical Study of Two Sample Courts," Indiana University Center for Chinese Politics and Business Working Paper No. 16 (2012).

[97] Renjun Bian, "Many Things You Know about Patent Infringement Litigation in China are Wrong," Nov. 2017, 52-53, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3063566.

[98] Ong, "Tackling Intellectual Property Infringement in China"; Kristina Sepetys and Alan Cox, *Intellectual Property Rights Protection in China: Trends in Litigation and Economic Damages* 10 (NERA Economic Consulting, 2009).

- 44 -

1  Guangzhou (as well as one other city in another of China's hi-tech hubs).  The

2  Beijing Internet Court has jurisdiction over all internet-related cases that could also

3  be brought in basic-level courts in Beijing, but with appeals in copyright

4  infringement case going to the specialized intermediate court-level Intellectual

5  Property Court for Beijing.  Its jurisdiction specifically extends to internet-based /

6  online infringements of copyrights.  During the Beijing Internet Court's first year of

7  operation (through 2019), it handled more than 30,000 cases, three-quarters of

8  which involved copyrights.  The court is open to foreign parties, and they have

9  made use of the court.  The Guangzhou Internet Court is similar to its Beijing

10  counterpart (including having appeals in copyright infringement cases go to

11  Guangzhou's specialized intermediate court-level Intellectual Property Court).

12  Proceedings in the internet courts can be conducted online, reducing costs and the

13  need for travel by parties, witnesses, and lawyers.[99]

14      82.    Parties, both Chinese and foreign, can, and do, bring successful

15  copyright infringement claims in Chinese courts (in the new internet courts as well

16  _____

17  [99] *See* China Justice Observer, China Establishes Three Internet Courts to Try
Internet-Related Cases Online, Dec. 16, 2018,

18  https://www.chinajusticeobserver.com/insights/china-establishes-three-internet-
courts-to-try-internet-related-cases-online.html; China Justice Observer, How to

19  Litigate Before the Internet Courts in China, Jan. 25, 2019,

20  https://www.chinajusticeobserver.com/a/how-to-litigate-before-the-internet-courts-
in-china; Supreme People's Court, Provisions on Several Issues Concerning the

21  Trial of Cases by Internet Courts (2018); Beijing Internet Court, White Paper on

22  Trials of Beijing Internet Court, Oct. 14, 2019,

23  https://www.chinadaily.com.cn/specials/20190820-B-0003-0904-F-
trialswhitepaper.pdf; Beijing Internet Court, White Paper on the Application of

24  Internet Technology in Judicial Practice, Sep. 18, 2019,

25  https://www.chinadaily.com.cn/specials/WhitePaperontheApplicationofInternetTec
hnologyinJudicialPractice.pdf; Guangzhou Internet Court, Court Profile,

26  https://www.gzinternetcourt.gov.cn/article-detail-65.html; Sara Xia, "China's

27  Internet Courts are Spreading; Online Dispute Resolution is Working," China Law
Blog, Dec. 23, 2018, https://www.chinalawblog.com/2018/12/chinas-internet-

28  courts-are-spreading-online-dispute-resolution-is-working.html.

as the longer-standing civil courts for intellectual property cases), including in cases with factual similarities to Plaintiffs' claims (for example, disseminating copyrighted works through electronic platforms or selling products that used the creator's art works without permission).[100]  Parties claiming copyright in photographic works have won infringement cases in Chinese courts (including the new internet court), including in cases where infringement occurred through dissemination over the internet.[101]

83.    The U.S. Chamber of Commerce's International IP Index reflects an increasingly positive assessment of China's intellectual property protection, ranking it slightly below median among the countries assessed (27th out of 45—a limited sample in which the higher-ranking countries are mostly economically highly

---

[100] *See*, for recent examples, *Beijing Leyang Intellectual Property Agency Co., Ltd. v. Tianjin Kumai Entertainment Development Co., Ltd.*, Jin Min Zhong No. 13 (Tianjin City High People's Court, 2020) (affirming lower court ruling for plaintiff claiming copyright infringement by defendant's playing copyrighted works through on-demand music streaming); *Wanda Children's Cultural Development Co. Ltd. v. Xi'an City New Town District Tongming Children's Products Store*, Shaan Min Zhong No. 459 (Shaanxi Provincial High People's Court, 2020) (affirming lower court ruling for plaintiff claiming infringement by defendant's selling products that included plaintiff's artwork); *Guangxi Beibu Gulf International Port Group Co., Ltd. v. Microsoft*, Gui Min Zhong No. 357 (Guangxi Zhuang Autonomous Region High People's Court, 2017) (affirming lower court judgment for Microsoft claiming infringement by unauthorized use of its software); "Peppa Pig: Copyright Infringement by Former Licensee," Lexology, May 23, 2019 (foreign plaintiff suing for infringement, in internet court).

[101] *See*, for examples, *Vancl Eslite (Beijing) Technology Co, Ltd. v. Beijing Panorama Vision Network Technology Co., Ltd.*, Jing 73 Min Zhong No. 1659 (Beijing Intellectual Property Court, 2019) (photographic works disseminated via information network / internet); *Inner Mongolia Daily News Agency v. Hu Shu, Beijing Xiaoban Technology Co., Ltd.,* Jing 73 Min Zhong No. 593 (Beijing Intellectual Property Court, 2020) (photographic works used in article, which was disseminated in part over information network / internet); *Beijing Hetu Creative Picture Co., Ltd. v. Xi'an Tangjiu Convenience Chain(store) Co., Ltd.*, Jing 0491 Min Chu No. 1507 (Beijing Internet Court, 2020) (dissemination of copyrighted photo over information network / internet).

developed and in which most lower-income countries were not included).[102]
Prominent expert U.S. observers recently have characterized China's legal regime
for intellectual property as having "transform[ed]" into a "less risky institution for
Western firms," in part through reforms that have "received insufficient attention"
abroad.[103]  Leading U.S. economists who study China have concluded that: China's
protection of intellectual property is improving; China's payments for licensing
foreign intellectual property have been on a sharply upward trajectory, placing
China among the top few countries as sources of such payments; and China is
becoming a significant producer, rather than receiver, of intellectual property—
which gives China an incentive for strong protection of intellectual property.[104]

## V. CHINA HAS LEGAL AND POLICY COMMITMENTS AND INTERESTS THAT SUPPORT PROTECTION OF INTELLECTUAL PROPERTY RIGHTS.

84.     Chinese authorities at the national level have made substantial
commitments to protecting intellectual property rights through law and courts, and
have significant reasons to do so.  As China pursued WTO membership and,
beginning in 2001, incurred the legal obligations of WTO membership, China had
to reform its relevant laws and practices to conform to international standards,
including those relating to intellectual property and specifically the TRIPS

---

[102] U.S. Chamber of Commerce, The Roots of Innovation: U.S. Chamber International IP Index, www.theglobalipcenter.com/wp-content/uploads/2017/02/GIPC_IP_Index_2017_Report.pdf, 19, 40-42.
[103] *See* Dan Prud'homme and Mark Cohen, "Overlooked Strategies for Surviving the US-China Trade War," World Financial Review, Oct. 10, 2019.
[104] *See*, for example, Nicholas R. Lardy, "China: Forced Technology Transfer and Theft?" Peterson Institute for International Economics, Apr. 20, 2018, https://www.piie.com/blogs/china-economic-watch/china-forced-technology-transfer-and-theft; Yukon Huang and Jeremy Smith, "China's Record on Intellectual Property Rights is Getting Better and Better," Foreign Policy, Oct. 16, 2019.

- 47 -

1 | agreement. The U.S., the EU, other developed states, and the business communities

2 | that influence such states' policies toward economic relations with China were

3 | sufficiently convinced of China's progress and commitments in these areas that

4 | they supported China's accession.

5 |      85.    Following China's accession to the WTO nearly two decades ago, it

6 | has faced—as it knew it would—monitoring by the WTO and fellow members, and

7 | scrutiny by the WTO's highly court-like dispute resolution process that covers

8 | TRIPS-based duties to provide adequate, international standard-meeting protection

9 | for foreign intellectual property and broader WTO obligations such as the

10 | imperative to provide "national treatment" (which requires that none of a state's

11 | trade-related laws, broadly defined, discriminate against foreigners) and adequate

12 | "judicial review" of trade-related administrative decisions.  Unlike almost all other

13 | international legal regimes, the WTO has effective means by which parties can

14 | lodge a complaint about another member's noncompliance with its obligations.

15 | WTO procedures for adjudicating complaints are generally seen as fair and

16 | effective, with winners receiving a binding decision that the losing party ordinarily

17 | implements (rather than face retaliatory measures that would be authorized by the

18 | WTO and accepted as legitimate internationally). Chinese authorities are acutely

19 | aware of these possibilities, as several WTO complaints have been initiated in

20 | recent years against China, some with successful outcomes for complaining parties.

21 | Bilateral monitoring, complaints that the U.S. can file, and has filed, in the WTO

22 | dispute resolution process, and threats of sanctions from the U.S. and others

23 | reinforce WTO rules and institutions.  China's intellectual property rights laws and

24 | regulations are generally acknowledged to have come into conformance with

25 | international standards and the international legal obligations that China has

26 | undertaken.

27 |      86.    China's leaders were willing to undertake WTO obligations in part

28 | precisely because membership created significant pressure to live up to WTO-

- 48 -

imposed obligations.  It is generally accepted that China's president and prime minister at the time wanted China to enter the WTO partly because it would provide an additional impetus to market-oriented economic reform and the construction of a more international standard-conforming and market-supporting legal system in China.  Their strategy sought to leverage China's carefully nurtured self-image as a state that fulfills its international obligations and the pressure that other WTO members would bring to bear, so that those at home who might oppose the substantive content of some WTO-driven reforms would be pressured into acquiescing.

## VI.   CHINA HAS AN INTEREST IN HAVING CHINESE COURTS HANDLE CASES INVOLVING INTELLECTUAL PROPERTY CLAIMS WITH CONNECTIONS TO CHINA; LITIGATING PLAINTIFFS' CLAIMS IN THE UNITED STATES WOULD FACE SIGNIFICANT DIFFICULTIES.

87.     The expressed policy and political goals of providing protection for the intellectual property produced and owned in China assumes, implies, or contemplates a large and dominant role for Chinese institutions, including Chinese courts in providing the judicial component of such protection.  Having such cases litigated outside of China reduces the opportunities for Chinese courts and Chinese state authorities to achieve, and demonstrate the achievement of those aims.

88.     Where a lawsuit involves the application of Chinese substantive law, China has an evident interest in having its courts interpret and develop those laws.  This general interest is especially prominent in the area of intellectual property law, which is (as discussed earlier) an area of high priority for the regime and an area where Chinese laws mandate the pursuit of policy goals that are complex and sometimes in tension with one another.  For example (and partly reminiscent of

- 49 -

well-known tensions in U.S. copyright law[105]), the Copyright Law's stated purposes include protecting rights, encouraging creation of works, encouraging dissemination of works, and promoting the construction of China's "spiritual and material civilization … culture and sciences."[106]

89.     To the extent that the infringement or the acts constituting infringement occur in China's territory, China has a similarly strong interest in having its courts (and its laws) adjudicate claims.  To the extent that proper defendants are, or include, Chinese nationals, China has an interest in adjudicating cases concerning their behavior.  (Indeed, many Chinese laws explicitly reach extraterritorially to govern the behavior of Chinese nationals—both natural persons and legal persons—abroad.)

90.     Relevant Chinese laws evince China's interests in having a significantly China-centered intellectual property dispute resolved by Chinese courts.  As noted above, the Civil Procedure Law and related Supreme People's Court Interpretations specifically contemplate the adjudication in Chinese courts of claims arising from acts or concerning objects in China, including copyright and other intellectual property cases.

91.     The Copyright Law casts judicial remedies—presumptively and sometimes explicitly in Chinese courts—as part of a broader web of means that the Chinese state provides for protecting copyright (as well as other intellectual property rights) and resolving disputes concerning them.  Administrative oversight, administrative enforcement and penalties, criminal sanctions and more affirmative or programmatic government measures—all necessarily undertaken by Chinese state organs and occurring exclusively or almost exclusively in China—are the

---

[105] Stephen Breyer, "The Uneasy Case of Copyright," 84 Harv. L. Rev. 281 (1970).
[106] Copyright Law, art. 1.

1   other parts of the package that also includes civil litigation which is expected to

2   occur in Chinese courts.[107]

3        92.    By United States standards, Chinese courts are not congested.  Official

4   statistics report timely clearance rates well above 90% generally and in intellectual

5   property rights cases specifically, notwithstanding the short (by American

6   standards) periods (ordinarily six to 12 months) provided in Chinese law for

7   resolving cases in a timely manner.[108] Although the reported rate of timeliness may

8   be overstated, there is general agreement that China has a high timely clearance rate

9   and that most cases proceed from court acceptance to resolution much more quickly

10   than is typical in the United States.

11

12   _____

13   [107] *See* Copyright Law, arts. 47-48; Copyright Regulations, art. 36.

14   [108] Civil Procedure Law, art. 149 (six months with possible six-month extension). The time limit (ordinarily six months from docketing of a case) specifically does

15   not apply to cases involving a foreign element (including a foreign party).  *See* Civil Procedure Law, art. 270.  This allows for longer periods, but not, in practice, wildly

16   longer periods.

17       Supreme People's Court, Work Report (to National People's Congress) (various years); 2013 version (addressing clearance rate covering prior five years)

18   available at http://www.china.com.cn/news/2013lianghui/2013-

19   03/10/content_28191634.htm; summary or 2018 version (data from prior five years) available at http://english.court.gov.cn/2018-03/09/content_35971310.htm

20   and full version (in Chinese) available at

21   http://www.xinhuanet.com/politics/2018lh/2018-03/25/c_1122587194.htm;

22   summary of 2019 version (describing establishment of new specialized IP courts and IP division in Supreme People's Court and 42% increase in IPR cases handled

23   annually in entire judicial system to 288,000) available at

24   http://english.court.gov.cn/2019-03/12/content_37449108.htm and full version (in Chinese) available at http://www.xinhuanet.com/politics/2019-

25   03/19/c_1124253887.htm; National Courts Conclude 781,000 Intellectual Property Rights Cases in Most Recent Five Years, July 9, 2018,

26   http://www.chinaiprlaw.cn/index.php?id=5312 (94.2% timely completion rate in

27   IPR cases, as reported at major IPR conference); *see also* Supreme People's Court, Intellectual Property Protection by Chinese Courts in 2017, § 1.1 (reporting

28   200,000 IPR cases accepted and 193,000 concluded in 2017).

93.     Significant legal and practical difficulties arise when litigating in a United States forum claims that depend for their resolution on evidence and witnesses located in China.  As noted above, Chinese law provides means for adjudicating in Chinese courts claims by foreign parties and involving evidence located abroad, and seeking cooperation from foreign jurisdictions in doing so.  As also noted above, Chinese law grants courts much authority to compel the production of evidence, but it does so in the context of litigation *in Chinese courts*.

94.     Chinese law, however, provides only limited and cumbersome mechanisms for requiring the production, especially for use in adjudication abroad, of types of evidence that play a central role in United States litigation.  As further noted above, the PRC system is inquisitorial rather than adversarial and therefore provides limited mechanisms for pretrial discovery, and adjudication in the PRC formally places more emphasis on documentary evidence and less on testimonial evidence than is typical in United States litigation.  Accordingly, the legal means in the PRC for inducing the production of and for authenticating documentary evidence are relatively strong, and those for securing testimonial evidence outside the context of testimony in a PRC court are relatively weak.

95.     Procuring evidence in China and providing it for use abroad poses significant difficulties.  Taking or compelling the production of evidence in China for use in judicial proceedings abroad, including in the U.S., is generally handled through procedures set forth in the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, and Chinese laws paralleling or implementing the Convention.[109]  With China, the Hague Convention process requires that a proper request go to China's Ministry of Justice (which China has designated as its Central Authority for the Convention), after which China's

---

[109] Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters; Civil Procedure Law, arts. 276-277.

1    Supreme People's Court reviews the request, passing approved requests on to the
2    relevant court in China for implementation.

3         96.    In practice, securing some forms of evidence in China for use abroad,
4    including in the United States, is extremely difficult and often impossible.
5    Acquiring documentary evidence in the PRC is especially limited in the context of
6    pretrial discovery.  According to the United States Department of State's
7    description (in a prior version of its page on "China Judicial Assistance" but
8    concerning an unchanged Chinese position):

9         Upon its accession to the Hague Evidence Convention, China declared
10        that "in accordance with Article 23 of the Convention concerning the
11        Letters of Request issued for the purpose of obtaining pre-trial
12        discovery of documents as known in common law countries, only the
13        request for obtaining discovery of the documents clearly enumerated in
14        the Letters of Request and of direct and close connection with the
15        subject matter of the litigation will be executed. . . . While it is
16        possible to request compulsion of evidence in China pursuant to a
17        letter rogatory or letter of request (Hague Evidence Convention), such
18        requests have not been particularly successful in the past.[110]

19
20   One recent analysis concluded, "[t]he likelihood of successfully acquiring
21   information through the Hague Evidence Convention when submitting a Letter of
22   Request to China is low. The process is protracted…. [T]he Hague Evidence
23   Convention is often considered practically useless as a way to get timely evidence

24   ────────────────
     [110] Quoted in part in Dan Harris, "How to Sue a Chinese Company. Part II.
25   Discovery," China Law Blog, Nov. 9, 2010,
     https://www.chinalawblog.com/2010/11/
26   how_to_sue_a_chinese_company_part_ii_discovery.html, Hans Bricken, "China
27   Litigation and Arbitration," https://harrisbricken.com/practice-areas/china-
     litigation-and-arbitration/, and Milliken & Co. v. Bank of China, 758 F.Supp.2d
28   238, 248 (SDNY 2010).

1   discovery from China."[111]

2       97.    Taking depositions in China for use abroad requires difficult and

3   lengthy processes at best and, without going through such processes, attempts to

4   take voluntary depositions are impracticable and very ill-advised.  The State

5   Department's current advisory concerning "China Judicial Assistance" states (and

6   practicing lawyers concur):

7       China does **not** permit attorneys to take depositions in China for use in

8       foreign courts. Under its Declarations and Reservations to the Hague

9       Evidence Convention and subsequent diplomatic communications,

10      China has indicated that taking depositions, whether voluntary or

11      compelled, and obtaining other evidence in China for use in foreign

12      courts may, as a general matter, only be accomplished through

13      requests to its Central Authority under the Hague Evidence

14      Convention.  Consular depositions would require permission from the

15      Central Authority on a case by case basis and the Department of State

16      will not authorize the involvement of consular personnel in a

17      deposition without that permission. Participation in such activity could

18      result in the arrest, detention or deportation of the American attorneys

19      and other participants.[112]

20

21  _____

22  [111] Ray Worthy Campbell and Ellen Claar Campbell, "Clash of Systems: Discovery
    in U.S. Litigation Involving Chinese Defendants," 4 Peking U. Transnat'l L. Rev.

23  129, 152-153, *cf.* 150-154 (2016).

24  [112] https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-
    Information/China.html. An earlier recent iteration was more detailed:

25

26      Traditionally, Chinese authorities do not recognize the authority or
        ability of foreign persons, such as American attorneys, to take

27      voluntary depositions of willing witnesses, even before a U.S. consular
        officer . . . . Given China's declaration on accession to the Hague

28      Evidence Convention that it does not consider itself bound by Articles

- 54 -

98.     Any litigation in U.S. courts that requires Chinese witnesses to appear faces difficulties that would not exist if the case were litigated in China.  Although restrictions have been greatly relaxed and barriers lowered in recent years, they have recently again become more formidable.  It can be difficult or impossible for Chinese citizens to secure a passport and to receive permission to leave China, especially at times required by U.S. courts in litigation proceedings.  Chinese

> 16-22 of Chapter II of the Convention, China could well deem taking depositions by American attorneys or other persons in China, as a violation of China's judicial sovereignty.  Such action could result in the arrest, detention, expulsion, or deportation of the American attorneys and other participants. . . .  The right to administer oaths in China is strictly governed by local Chinese law and applicable treaty.  A person authorized to administer oaths in the United States may not be recognized by Chinese authorities as empowered to perform that function in China.  Even a Chinese "notary" or other person empowered to administer oaths may not be recognized by Chinese authorities as empowered to do so in connection with depositions, given China's strict position on that question.  Conducting a deposition in a hotel with oaths to be administered by such a private person could have serious implications for the individual administering the oath, as well as other participants. . . .  [T]he Chinese Ministry of Foreign Affairs advised the U.S. Embassy that if a court of the United States requests the depositions of witnesses resident in the People's Republic of China, it is necessary to submit a letter rogatory through the diplomatic channel.  The Chinese Ministry of Foreign Affairs . . . . note said that for a U.S. consular officer to receive or witness statements made under oath or affirmation in China in contravention of Chinese law would not conform to the provisions of the U.S. - China bilateral consular convention. . . .

*See also* Meg Utterback and Holly Blackwell, "Obtaining Discovery in China for Use in U.S. Litigation," King & Wood China Law Insight, April 28, 2012, http://www.chinalawinsight.com/2012/04/articles/dispute-resolution/obtaining-discovery-in-china-for-use-in-us-litigation/ (much narrower conception of discovery in China and severe impediments under Chinese law to acquiring evidence that would be relatively routinely produced under U.S. discovery rules); Craig Allely, "Key Steps to Successful Foreign Depositions" Litigation (Summer 2011) (China has granted permission for one U.S. deposition to be taken in China in last 30 years).

- 55 -

nationals who do not face such impediments still may not be able to get a visa to travel to the United States or receive such a visa within a feasible time frame. Americans who do business with China or who arrange conferences and meetings in the United States with Chinese participants have long complained about how their projects are frustrated or made impossible by delays or denials of their Chinese counterparts' applications for visas to travel to the United States.  In the last few years, difficulties and delays for Chinese citizens receiving visas to travel to the United States have increased significantly (and more than has been the case for U.S. citizens seeking visas for travel to China).[113]  With the outbreak of the novel coronavirus pandemic and U.S. policy measures responding to it, witnesses located in China are all but certainly unable to travel to the United States for an indefinite, and possibly very extended, period.[114]

99.    I declare under penalty of perjury that the foregoing is true and correct. Executed on this 17th day of August 2020, at Villanova, Pennsylvania.


Jacques deLisle

Jacques deLisle

---

[113] *See, e.g.*, Jessica Donati and Te-Ping Chen, "It Just Got Harder for Chinese People to Secure U.S. Visas," Wall St. J., May 30, 2018; Elizabeth Redden, "Chinese Students, Scholars Report Visa Delays," Inside Higher Ed, Apr. 26, 2019.
[114] President Donald J. Trump, Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Persons who Pose a Risk of Transmitting 2019 Novel Coronavirus, January 31, 2020, https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/ (applicable to aliens who have been in China during two weeks prior to attempt to enter the United States; restriction in force until further notice).

- 56 -

C.V.

**Jacques deLisle**

University of Pennsylvania Law School
3501 Sansom Street
Philadelphia, PA 19104-6204
(215) 898-5781
Fax: (215) 573-2025
jdelisle@law.upenn.edu

**EMPLOYMENT:**

Stephen A. Cozen Professor of Law, 2006-, Professor of Law, 1999-2006, Assistant Professor of
    Law, 1994-99
    Professor of Political Science, 2010-
    Director, Center for East Asian Studies, 2009-2019, Member of CEAS Faculty, 1996-
    Director, Center for the Study of Contemporary China, 2019-, Deputy Director, 2012-
    2019
    Co-Director, Center for Asian Law, 2014-

    *Research Interests*: Law and politics of China, legal reform in China, law and economic
    and political change in China, China and international law, international status of Taiwan,
    cross-Strait and Mainland-Hong Kong relations, comparative and international law,
    China's foreign relations

    *Courses*:
    Chinese Law; Law and Economic Reform in Contemporary China (seminar); Law and
    the Economy in China (seminar); China and International Law (seminar); China and
    International Human Rights; China and International Human Rights Law; International
    Law; Selected Topics in International Law (seminar); Torts
    International Law and International Relations (Lauder M.B.A.-M.A. Program, University
        of Pennsylvania)
    China in an Era of Transition, Reform and Globalization (Organizational Dynamics
        Program, University of Pennsylvania)
    China and International Law (National University of Singapore)
    Law and the Economy in China (Tel Aviv University)
    Government and Politics of the PRC; External Politics of the PRC (Universidad de
        Aveiro, Portugal)
    The Common Law of Civil Obligations; The U.S. Structural Constitution (Waseda
        University, Tokyo)

    Visiting Professor, Universidad de Aveiro (Portugal, short-term, 1999-2002), National
    University of Singapore (summer 2004), Waseda University (summer 2007), Tel Aviv
    University (spring 2014); Visiting Scholar, University of Hong Kong Law School (May
    2012)

Director, Asia Program, Foreign Policy Research Institute, 2002-, Senior Fellow, 1999-

Attorney-Adviser, Office of Legal Counsel, United States Department of Justice, 1992-94

Law Clerk to Stephen G. Breyer, United States Court of Appeals for the First Circuit, 1991-92

**EDUCATION:**

Harvard Law School, J.D. *magna cum laude*, 1990

Harvard Graduate School of Arts and Sciences, Department of Government, Ph.D. program
(ABD)

Princeton University, A.B. *summa cum laude*, Phi Beta Kappa, 1982
Major: Public and International Affairs

**PUBLICATIONS:**

*The Chinese Model of Law, China's Agenda in International Law, and Implications for
Democracy in Asia and Beyond* in DEMOCRATIZATION, NATIONAL IDENTITIES, AND
FOREIGN POLICY IN ASIA (Gilbert Rozman, ed., Routledge, forthcoming 2021)

*Introduction: Change, Continuity, and Challenges for Taiwan in the Tsai Era* (with June Teufel
Dreyer) in TAIWAN IN THE ERA OF TSAI ING-WEN: CHANGES AND CHALLENGES (June
Teufel Dreyer and Jacques deLisle, eds. Routledge, forthcoming 2021)

*U.S.-Taiwan Relations: Do Past Patterns Persist in the Tsai Era?* (with Vincent Wei-cheng
Wang) in TAIWAN IN THE ERA OF TSAI ING-WEN: CHANGES AND CHALLENGES (June
Teufel Dreyer and Jacques deLisle, eds. Routledge, forthcoming 2021)

*Taiwan's Quest for International Space in the Tsai Era: Adapting Old Strategies to New
Circumstances* in TAIWAN IN THE ERA OF TSAI ING-WEN: CHANGES AND CHALLENGES
(June Teufel Dreyer and Jacques deLisle, eds. Routledge, forthcoming, 2021)

*Rivalry and Security in a New Era for U.S.-China Relations* (with Avery Goldstein) in AFTER
ENGAGEMENT: DILEMMAS IN U.S.-CHINA SECURITY RELATIONS __-__ (Jacques deLisle
and Avery Goldstein, eds. Brookings, forthcoming, 2021)

*Editor's Corner: Political Warfare, Sharp Power, the U.S., and East Asia,* ORBIS, vol. 64, no. 2
(Spring 2020), 1-7

*Foreign Policy through Other Means: Hard Power, Soft Power, and China's Turn to Political
Warfare to Influence the United States,* ORBIS, vol. 64, no. 2  (Spring 2020), 174-206.

[2]

*Authoritarian Legality in East Asia: What, Why, and Whither?* in AUTHORITARIAN LEGALITY IN ASIA: FORMATION, DEVELOPMENT AND TRANSITION 17-59 (Weitseng Chen and Hualing Fu, eds. Cambridge, 2020)

*The Path of Administrative Law in China* (with Neysun Mahboubi) in UNIVERSITY OF PENNSYLVANIA ASIAN LAW REVIEW (forthcoming 2021)

*Inspecting Implementation and Accruing Authority: The National People's Congress Standing Committee and Zhifa Jiancha* (with Lin Yan) in UNIVERSITY OF PENNSYLVANIA ASIAN LAW REVIEW (forthcoming 2021)

*The Taiwan Relations Act at 40: A Troubled but Durable Legal Framework for U.S. Policy*, ASIA POLICY, vol. 14, no. 3, 35-42 (October 2019).

*Hong Kong's Summer of Discontent: Another Battle in the Long War over Autonomy, Democracy, and the Rule of Law*, ORBIS, vol. 63, no. 3, 473-504 (Fall 2019)

*International Law and Institutions* in TAIWAN: THE DEVELOPMENT OF AN ASIAN TIGER 171-206 (Hans Stockton and Yao-Yuan Yeh, eds., Lynne Rienner, 2019)

*China's Economic Reform and Opening at Forty: Past Accomplishments and Emerging Challenges"* (with Avery Goldstein) in TO GET RICH IS GLORIOUS: CHALLENGES FACING CHINA'S ECONOMIC REFORM AND OPENING AT FORTY 1-26 (Jacques deLisle and Avery Goldstein, eds. Brookings, 2019)

*China's Legal System* in POLITICS IN CHINA: AN INTRODUCTION 224-253 (3rd edition, William A. Joseph, ed., Oxford, 2019)

*"All the World's a Stage": Taiwan's Human Rights Performance and Playing to International Norms* in TAIWAN AND INTERNATIONAL HUMAN RIGHTS: A STORY OF TRANSFORMATION 173-206 (Jerome A. Cohen, William P. Alford, and Chang-Fa Lo, eds. Springer, 2019)

*The Chinese Model of Law, China's Agenda in International Law, and Implications for Democracy in Asia and Beyond,* ASAN FORUM (September 2018) http://www.theasanforum.org/the-chinese-model-of-law-chinas-agenda-in-international-law-and-implications-for-democracy-in-asia-and-beyond/

*International Law in US-China Relations: Trade Wars and Maritime Rights in the Era of Xi and Trump* ASAN FORUM (August 2018) http://www.theasanforum.org/international-law-in-us-china-relations-trade-wars-and-maritime-rights-in-the-era-of-xi-and-trump/

*Washington-Taipei Relations at a Crossroads: Introduction,* THE CHINA REVIEW, vol. 18, no. 3, 1-11 (2018) (with Lin Gang, guest co-editors, special issue)

[3]

*United States-Taiwan Relations: Tsai's Presidency and Washington's Policy,* THE CHINA REVIEW, vol. 18, no. 3, 13-59 (2018)

*China's Rise, the U.S. and the WTO: Perspectives from International Relations Theory*, 2018 UNIVERSITY OF ILLINOIS LAW REVIEW Online 57-71 (2018) (a response to Gregory Shaffer and Henry Gao, *China's Rise: How it Took on the U.S. at the WTO*)

*How International is International Law? (Remarks on Implications of a Rising China)* 111 ASIL PROCEEDINGS 75-78 (2018)

*Political Implications of the July 2016 Arbitration Decision in the Philippines-PRC Case Concerning the South China Sea: The United States, China, and International Law* in ASIAN YEARBOOK OF INTERNATIONAL LAW, vol. 21 49-82 (2015, published 2017)

*China's Maritime Disputes in the South and East China Seas: What Role for International Law?* in CHINA'S GLOBAL ENGAGEMENT: COOPERATION, COMPETITION, AND INFLUENCE IN THE 21ST CENTURY (Jacques deLisle and Avery Goldstein, eds., Brookings, 2017) 235-290

*Democracy and Constitutionalism in China's Shadow: Sunflowers in Taiwan and Umbrellas in Hong Kong* in LAW AND POLITICS OF THE TAIWAN SUNFLOWER AND HONG KONG UMBRELLA MOVEMENTS  205-231 (Brian Christopher Jones, ed., Routledge, 2017) 205-231

*From Accepting to Challenging the Law of the Sea?: China and the South China Sea Disputes* in LEGAL THOUGHTS BETWEEN THE EAST AND THE WEST IN THE MULTILEVEL LEGAL ORDER: A LIBER AMICORUM IN HONOR OF PROFESSOR HERBERT H.P. MA 255-276 (Lo Chang-fa, ed., Springer, 2016)

*Law in the China Model 2.0: Legality, Developmentalism and Leninism under Xi Jinping* in JOURNAL OF CONTEMPORARY CHINA, vol. 26, no. 103, 68-84 (2016)

*Taiwan in the Tsai Era* (with June Teufel Dreyer) ORBIS, vol. 60, no. 4, 465-472 (Fall 2016)

*Taiwan's Quest for International Space: Ma's Legacy, Tsai's Options, China's Choices, and U.S. Policy*, ORBIS, vol. 60, no. 4, 550-574 (Fall 2016)

*International Law in the Obama Administration's Pivot to Asia: The China Seas Disputes, the Trans-Pacific Partnership, Rivalry with the PRC, and Status Quo Legal Norms in U.S. Foreign Policy* in 48 CASE WESTERN RESERVE JOURNAL OF INTERNATIONAL LAW 143-176 (2016)

[4]

*Introduction: The Internet, Social Media and a Changing China* (with Avery Goldstein and Guobin Yang) in THE INTERNET, SOCIAL MEDIA AND A CHANGING CHINA 1-27 (Jacques deLisle, Avery Goldstein and Guobin Yang, eds., University of Pennsylvania, 2016)

THE BEST OF FPRI'S ESSAYS ON ASIA (editor and contributor, FPRI E-Book, 2016, http://www.fpri.org/articles/2016/01/best-fpris-essays-asia-2005-2015)

*Xi Jinping's Impact on China's Legal Development: Domestic and International*, ASAN FORUM, vol. 3, no. 5, 42-63 (September-October 2015) http://www.theasanforum.org/xi-jinpings-impact-on-chinas-legal-development-domestic-and-international/

*The Rule of Law with Xi-Era Characteristics: Law for Economic Reform, Anticorruption and Illiberal Politics*, in Roundtable: The Future of "Rule According to Law" in China, ASIA POLICY (National Bureau of Asian Research), no. 20, 23-29 (July 2015)

*Review of Chinese Contemporary Perspectives on International Law by Xue Hanqin*, 108 AMERICAN JOURNAL OF INTERNATIONAL LAW 850-56 (2015)

*China's Challenges: Reform Era Legacies and the Road Ahead* (with Avery Goldstein) in CHINA'S CHALLENGES 1-24 (Jacques deLisle and Avery Goldstein, eds., University of Pennsylvania, 2014)

*Law and Democracy in China: A Complicated Relationship* in DEMOCRATIZATION IN CHINA, KOREA AND SOUTHEAST ASIA?: LOCAL AND NATIONAL PERSPECTIVES 126-140 (Shelley Rigger, Lynn White and Kate Zhou, eds., Routledge, 2014)

*China's Legal System* in POLITICS IN CHINA: AN INTRODUCTION 224-253 (2nd edition, William A. Joseph, ed., Oxford, 2014)

*Law and the Economy* in HANDBOOK OF THE CHINESE ECONOMY 255-279 (Gregory Chow and Dwight Perkins, eds., Routledge, 2014)

*Introduction: Taiwan at the Crossroads* (with Jean-Pierre Cabestan) in POLITICAL CHANGES IN TAIWAN UNDER MA YING-JEOU: PARTISAN CONFLICT, POLICY CHOICES, EXTERNAL CONSTRAINS AND SECURITY CHALLENGES 1-12 (Jean-Pierre Cabestan and Jacques deLisle, eds., Routledge, 2014)

*Taiwan and Soft Power: Competing with China and Seeking Security* in POLITICAL CHANGES IN TAIWAN UNDER MA YING-JEOU: PARTISAN CONFLICT, POLICY CHOICES, EXTERNAL CONSTRAINS AND SECURITY CHALLENGES 265-295 (Jean-Pierre Cabestan and Jacques deLisle, eds., Routledge, 2014)

[5]

*China's Changing Approach to Sovereignty in International Law?: Lessons from Territorial Disputes and Human Rights* in 107 AMERICAN SOCIETY OF INTERNATIONAL LAW PROCEEDINGS 348-352 (2014)

*Damages Remedies for Infringement of Human Rights under U.S. Law* in AMERICAN JOURNAL OF COMPARATIVE LAW (SUPP.) 457-490 (2014)
revised version in DAMAGES FOR VIOLATIONS OF HUMAN RIGHTS—A COMPARATIVE STUDY OF DOMESTIC LEGAL SYSTEMS 395-426 (Ewa Bagińska, ed., Springer Verlag, 2016)

*Comment on Shi Hexing, "The People's Congress System and China's Constitutional Development* in CHINA'S POLITICAL DEVELOPMENT 120-130, 134-135 (Kenneth Lieberthal and Yu Keping, eds., Brookings, 2014).  Chinese version: *Comment on Shi Hexing's Essay of "The People's Congress System and the Development of Constitutionalism in China"* in CHINA'S POLITICAL DEVELOPMENT: FROM THE VIEW OF AMERICAN AND CHINESE SCHOLARS 120-130 (Yu Keping and Kenneth Lieberthal, eds., Brookings, 2014)

*From Economic Development to What—and Why?* in RETHINKING LAW AND DEVELOPMENT: THE CHINESE EXPERIENCE 107-145 (Yu Guanghua, ed., Routledge, 2013)

*Troubled Waters: China's Claims and the South China Sea,* ORBIS, vol. 56 no. 4, 608-642 (2012)

*A Common Law-like Civil Law and a Public Face for Private Law: China's Tort Law in Comparative Perspective* in TOWARDS A CHINESE CIVIL CODE 353-394 (Chen Lei and C.H. (Remco) van Rhee, eds., Martinus Nijhoff, 2012)

*Law and China's Development Model* in IN SEARCH OF CHINA'S DEVELOPMENT MODEL: BEYOND THE BEIJING CONSENSUS 147-165 (Philip Hsu, Yushan Wu and Suisheng Zhao, eds., Routledge, 2011)

*The Internationalization of Law and its Implications for Legal Education: Lessons from Interactions between the United States and China* in CROSS STRAIT / FOUR REGION: LAW DEVELOPMENTS IN TAIWAN, CHINA, HONG KONG AND MACAU vol. 1, 1-30 (Dennis T.C. Tang and Chi Chung, eds., Academia Sinica, 2011)

*Soft Power in a Hard Place: China, Taiwan, Cross-Strait Competition and U.S. Policy* ORBIS vol. 54 no. 4, 493-524 (2010)

*Security First?: Patterns and Lessons from China's Use of Law to Address National Security Threats* 4 JOURNAL OF NATIONAL SECURITY LAW & POLICY 397-436 (2010)

*Consumer Protection in Transnational Contexts (U.S. Law)* (with E. Trujillo) 58 AMERICAN JOURNAL OF COMPARATIVE LAW (SUPP.) 135-164 (2010),

[6]

alternative version in CONSUMER PROTECTION IN INTERNATIONAL PRIVATE RELATIONSHIPS 509-546 (Diego P. Fernando Arroyo ed., Springer, 2010)

*Exceptional Powers in an Exceptional State: Emergency Powers Law in China* in EMERGENCY POWERS LAW IN ASIA 342-390 (Victor V. Ramraj and Arun K. Thiruvengadam, eds, Cambridge, 2010)

*The Other China Trade Deficit: Export Safety Problems and Responses* in IMPORT SAFETY: REGULATORY GOVERNANCE IN THE GLOBAL ECONOMY 22-49 (Cary Coglianese, David Zaring, and Adam Finkel, eds., University of Pennsylvania, 2010)

*After the Gold Rush: The Beijing Olympics and China's Evolving International Roles,* ORBIS vol. 52, no. 3, 179-204 (2009)

*Development without Democratization? China, Law and the East Asian Model* in DEMOCRATIZATIONS: COMPARISONS, CONFRONTATIONS AND CONTRASTS 197-232 (Jose V. Ciprut, ed., MIT, 2009)

*Vicious Cycles and Virtuous Circles: International Contexts, Taiwanese Democracy and Cross-Strait Relations* in CROSS-STRAIT AT THE TURNING POINT 373-424 (I Yuan, ed., Institute for International Relations, 2009)

*International Contexts and Domestic Pushback* in POLITICAL CHANGE IN CHINA: COMPARISONS WITH TAIWAN 185-211 (Bruce Gilley and Larry Diamond, eds., Lynne Rienner, 2008)

*'One World, Different Dreams': Assessing the Struggle to Define the Beijing Olympics* in OWNING THE OLYMPICS: NARRATIVES OF THE NEW CHINA 17-66 (Monroe E. Price and Daniel Dayan, eds., University of Michigan, 2008)

*Legalization without Democratization in China under Hu Jintao* in CHINA'S CHANGING POLITICAL LANDSCAPE: PROSPECTS FOR DEMOCRACY 185-211 (Cheng Li, ed., Brookings, 2008)

*Traps, Gaps and Law: Prospects and Challenges for China's Reforms* in IS CHINA TRAPPED IN TRANSITION? IMPLICATIONS FOR FUTURE REFORMS (Oxford Foundation for Law, Justice and Society, 2007)

*Legislating the Cross-Strait Status Quo?: China's Anti-Secession Law, Taiwan's Constitutional Reform, and the U.S.'s Taiwan Relations Act* in ECONOMIC INTEGRATION, DEMOCRATIZATION AND NATIONAL SECURITY IN EAST ASIA 101-138 (Peter C.Y. Chow, ed., Edward Elgar, 2007)

*Eroding, Not Attacking, the "One China Policy": Participating in International Regimes without*

[7]

*State Membership, Choosing Symbolic Struggles with Substantive Content, and Getting Help from U.S. Law* in RESHAPING THE TAIWAN STRAIT 111-145 (John Tkacik, Jr., ed., Heritage Foundation, 2007)

*Free Trade Areas in East Asia: Legal and Economic Liberalism and the Interest-Based Politics of U.S., PRC and Taiwan Participation* in FREE TRADE AND EAST ASIA (Jacques deLisle, ed., Foreign Policy Research Institute, 2007)

*Pressing Engagement: Uneven Human Rights Progress in China, Modest Successes of American Policy, and the Absence of Better Options* (Carnegie Endowment for International Peace, "China Debates" series, 2007)

*Navigating a Dangerous Strait: Assessing Responsibility, Defining Interests and Prescribing Tactics in Relations among Taiwan, China and the International Community* TAIWAN JOURNAL OF DEMOCRACY vol. 2, no. 1 123-130 (review essay 2006)

*China under Hu Jintao: Introduction* (with T.J. Cheng and Deborah Brown) in CHINA UNDER HU JINTAO: OPPORTUNITIES, DANGERS AND DILEMMAS, 1-25, 229-292 (Jacques deLisle, T.J. Cheng and Deborah Brown, eds., World Scientific, 2006)

*China and the WTO: Evolving Agendas of Economic Openness, Domestic Reform and Challenges of the Post-Accession Era* in CHINA UNDER HU JINTAO: OPPORTUNITIES, DANGERS AND DILEMMAS, 1-25, 229-292 (Jacques deLisle, T.J. Cheng and Deborah Brown, eds., World Scientific, 2006)

*Atypical Pneumonia and Ambivalent Law and Politics: SARS and the Response to SARS in China* 77 TEMPLE LAW REVIEW 193-245 (2004)

*Reforming / Replacing the ROC Constitution: Implications for Taiwan's State(-like) Status and U.S. Policy*, WOODROW WILSON INTERNATIONAL CENTER ASIA PROGRAM SPECIAL REPORT 12-18 (November 2004)

*Democratization and Its Limits in Greater China*, ORBIS, vol. 48, no. 2, 193-203 (2004)

*The Common Law of Causation in Tort and Questions of Policy and Institutions in the Development of Chinese Tort Law*, FAZHI CANKAO [LEGAL MATERIALS JOURNAL] 2004, no. 5, Democracy and the Legal System Press, under the National People's Congress, People's Republic of China) 122-124 (in Chinese 2004)

[8]

*SARS and the Pathologies of Globalization and Transition in Greater China*, ORBIS, vol. 47, no. 4, 587-604 (2003) (conference volume on Asia's Shifting Strategic Landscape)

*Human Rights, Civil Wrongs and International Politics: A 'Sinical' Look at the Use of U.S. Litigation to Address Abuses Abroad*, 52 DEPAUL LAW REVIEW 473-561 (2003) (conference volume on American Civil Justice in a Global Context)

*Chasing the God of Wealth while Evading the Goddess of Democracy: Development, Democracy and Law in Reform-Era China,* in DEVELOPMENT AND DEMOCRACY: NEW PERSPECTIVES ON AN OLD DEBATE 252-293 (Sunder Ramaswamy & Jeffrey W. Cason, eds., University Press of New England, 2003)

*The China-Taiwan Relationship: Law's Spectral Answers to the Cross-Strait Sovereignty Question*, ORBIS, vol. 46, no. 4, 733-752 (2002) (conference volume on sovereignty and cross-Strait relations)

*The Roles of Law in the War on Terrorism,* ORBIS, vol. 46, no. 2, 301-320 (2002)

*Humanitarian Intervention: Legality, Morality, and the Good Samaritan*, ORBIS, vol. 45, no. 3, 535-556 (2001)

*The Rule of Law and the Roles of Law in China* (review essay of *The Limits of the Rule of Law in China*) in SINO-PLATONIC PAPERS, Reviews IX, October 2000, 1-21

*China's Approach to International Law: A Historical Perspective*, 94 AMERICAN SOCIETY OF INTERNATIONAL LAW PROCEEDINGS 267-275 (2000)

*The Chinese Puzzle of Taiwan's Status*, ORBIS, vol. 44, no. 1, 35-62 (2000)

*The P.R.C.'s Population and Family Planning Policies:  Legal Issues and Social Consequences in the Mainland and the United States* in LIANG-AN SHE-HUI PIEN-CH'IEN-CHUNG CHIA-T'ING YÜ-CH'I HSIANG-KUAN WEN-T'I HSÜEH-SHU YEN-CHIU T'AN-HUI HUI-I LUN-WEN-CHI 239-260 (Fu-jen Ta-hsüeh She-hui Wen-hua Yen-chiu Chung-hsin, 1999)

*The Taiwan Question*, SINO-AMERICAN RELATIONS, Winter 1999, 22-28

*Lex Americana?: United States Legal Assistance, American Legal Models, and Legal Change in the Post-Communist World and Beyond*, 20 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 179-308 (1999)

*The East Asian Debate on International Human Rights: Domestic Approaches and Attitudes in the Absence of Regional Commitments*, 92 AMERICAN SOCIETY OF INTERNATIONAL LAW PROCEEDINGS 64-66 (1998) (co-author)

*Sovereignty Resumed: China's Conception of Law for Hong Kong, and its Implications for the SAR and US-PRC Relations*, HARVARD ASIA QUARTERLY 21-27 (Summer 1998)

*Political Alchemy, the Long Transition and Law's Promised Empire: How July 1, 1997 Matters -- and Doesn't Matter -- in Hong Kong's Return to China*, 18 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 69-131 (1997) (symposium issue on Hong Kong's transition from British colony to Chinese Special Administrative Region)

*Hong Kong's Endgame and the Rule of Law (I): The Struggle over Institutions and Values in the Transition to Chinese Rule*, 18 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 195-254 (1997) (with Kevin P. Lane)

*Hong Kong's Endgame and the Rule of Law (II): The Battle over "the People" and the Business Community in the Transition to Chinese Rule*, 18 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 811-1047 (1997) (with Kevin P. Lane)

*Cooking the Rice without Cooking the Goose: The Rule of Law, the Battle over Business, and the Quest for Prosperity in Hong Kong After 1997* (with Kevin P. Lane) in HONG KONG UNDER CHINESE RULE: THE ECONOMIC AND POLITICAL IMPLICATIONS OF REVERSION 31-70 (Warren I. Cohen & Zhao Li, eds., Cambridge, 1997)

*Of Chinese Walls, Battering Rams and Building Permits: Five Lessons about International Economic Law from Sino-U.S. Trade and Investment Relations*, 17 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 513-532 (1996)

*Disquiet on the Eastern Front: Liberal Agendas, Domestic Legal Orders, and the Role of International Law after the Cold War and amid Resurgent Cultural Identities*, 18 FORDHAM INTERNATIONAL LAW JOURNAL 1725-1741 (1995) (symposium issue on the roles of international law in the twenty-first century)

*Massacre in Beijing: The Events of 3-4 June and their Aftermath* (Ad Hoc Study Group on Human Rights in China, and International League for Human Rights, 1989) (co-author)

*China's Foreign Economic Contract Law and Technology Import Regulations*, 27 HARVARD INTERNATIONAL LAW JOURNAL 275-283 (1986)

**OTHER WRITINGS AND COMMENTARY:**

Op-eds/commentary/essays for newspapers and other media, including *The Asian Wall Street Journal*, *The Philadelphia Inquirer*, *Foreign Policy Research Institute E-notes, China Online*, *Asia Times, Free China Journal*, *The American, The Asan Forum, Global Times,*

[10]

*Nikkei Weekly, AACS Newsletter, Taiwan Insight,* and *The Penn Law Journal*; titles include:

The Legacy of Taiwan's Lee Teng-hui

China's Administrative State is Both a Blessing and a Curse in COVID-19

Tsai's Rocky Road: Challenges in Tsai's Second Term

Taiwan and the WHO in 2020: A Novel Virus and Viral Politics

Beyond COVID-19: U.S.-China Relations at a Standstill

Pursuing Politics through Legal Means: U.S. Efforts to Hold China Responsible for COVID-19

Unconventional Candidates and Cross-Strait Relations in Taiwan's 2020 Presidential Campaigns

The 40th Anniversary of the Taiwan Relations Act

Red State China: Why China (Sort of) Likes Trump

The South China Sea Arbitration Decision: China Fought the Law and the Law Won…Or Did It?

Why President Ma Ying-jeou's Day Trip to Taiping Island was Such a Big Deal

Taiwan's 2016 Elections and Cross-Strait Relations

Mr. Xi Meets Mr. Ma for a Singapore Fling

Blurring Borders: National, Subnational, and Regional Orders in East Asia—An FPRI Conference Report

Reflections on the Umbrella Movement in Hong Kong

Two Sessions Work Advances Rule of Law

Legal Reform Promised in China Though the Party is Still the Law

China and International Law/Norms: A US Perspective

China and the World: The View from Salzburg, Then and Now

Energy, Environment and Security in Asia—An FPRI Conference Report

Contested Terrain: China's Periphery and International Relations in Asia—An FPRI Conference Report

Taiwan's 2012 Presidential and Legislative Elections: Winners, Losers, and Implications

9/11 and U.S.-China Relations (10 Years After)

Politics and Governance in the People's Republic of China

Strait Ahead? China's Fifth Generation Leaders and Beijing's Taiwan Policy

Taiwan: Sovereignty and Participation in International Organizations

Dragon and (Legal) Eagle: International Law and American Interests in U.S.-China Relations beyond the Hu-Obama Summit

A Tale of Two Summits: Hu Jintao in Washington, Wen Jiabao in New Delhi and U.S.-China-India Relations

The Elephant in the Room: Summitry and China's Challenging Relations with Great Powers in Asia

Taiwan: Elections at Home, Economic Relations with the Mainland and U.S.-China-Taiwan Relations (An FPRI Symposium Report)

Regional Security in East Asia (An FPRI Conference Report)

What's Happened to Democracy in China?: Elections, Law and Reform (An FPRI Symposium Report)

[11]

Power in East Asia (An FPRI Conference Report)

Hu, Obama and U.S.-China Economic and Legal Relations: Structural Issues the Summit Will Not Address but Should Not Ignore

China Policy under Obama

The U.S. Elections and America's Role in East Asia: Views from the Region— An FPRI Roundtable Report

China is a Rising Star, but Unusually Weak and Poor

Elections, Political Transitions and Foreign Policy in East Asia: An FPRI Conference Report

China's Legal Encounter with the West

Taiwan in the World Health Assembly: A Victory, With Limits

Taiwan under President Ma Ying-jeou: A Horse of a Different Color? – Democracy and Distrust in Taiwan

Taiwan under President Ma Ying-jeou: Changing Horses in the Middle of the Strait? – Taiwan's External Relations

Playing for Keeps (The Beijing 2008 Olympics)

Kind of Blue?: Implications of Taiwan's 2008 Elections

China Rising: Assessing China's Economic and Military Power—An FPRI Conference Report

Into Africa: China's Quest for Resources and Influence

Free Trade Areas: Legal Aspects and the Politics of U.S., PRC and Taiwan Participation

Free Trade Areas in East Asia: An FPRI Symposium Report

Constitutional Change and Foreign Policy in East Asia: An FPRI Conference Report

Taiwan's Democracy and Lessons from Yet Another Election

Party Politics and Foreign Policy in East Asia: An FPRI Conference Report

China after Jiang: Two Strengths and Five Unresolved Issues

The Aftermath of Taiwan's Presidential Election: An FPRI Symposium Report

Fifteen Years after Tiananmen: Persistence, Memory and Change in China

Democracy and Its Limits in Greater China: An FPRI Conference Report

Asia's Shifting Strategic Landscape: An FPRI Conference Report

Illegal? Yes; Lawless? Not So Fast: The U.S., International Law and Iraq

Sinical Voters?: Elections in Greater China

Bless and Keep the S.A.R. . . . . Far Away From Us: Taiwan's Hong Kong Phobia, Five Years On

Humanitarian Intervention: The International Law and Morality of Force and Rescue

Varieties of Sovereignty and Cross-Strait Relations: A Conference Report

Politics, Law and Resentment on the China Coast

U.S. Policy toward Taiwan: Sustaining the Status Quo

The [2000 Presidential] Election, Sausages and Foreign Policy

Foreign Affairs, Federalism and Well-Meaning-Mischief: The Constitutional Infirmity of Massachusetts's Burma Law

A Progression of Reform [for Law in China]: Not Revolution but Evolution

Fifty Years after the Revolution [in China]

Who's Afraid of Falun Gong?

[12]

Appeal of Falun Gong Puts Strain on Beijing
The Taiwan Question
Chinese Law: A Middle Path for the Middle Kingdom
Impeachment: It's Political Not Judicial
Hong Kong's Legal Crisis (with Kevin P. Lane)

Commentary/interviews for major television and radio stations, newspapers, and magazines in the United States, East Asia and Europe

**FELLOWSHIPS AND AWARDS:**

University of Pennsylvania China Research and Engagement Fund Grant and Henry R. Luce Foundation Grant (project on the Future of United States-China Relations), 2020-21

Global Law Faculty, Peking University Law School, 2018-

Honorary Guest Professor, Renmin University Law School (Beijing), 2014-17

Taipei Economic and Cultural Office research grant, 2008 (for research in Taiwan on cross-Strait relations)

Salzburg Seminar: Faculty (China as a Superpower Session), 2012, Senior Fellow, (Asian Law Session), 2002, Fellow, (Freeman Foundation Symposia "East Asia-United States: A Search for Common Values"), 1998, 1999, 2000, Fellow (U.S. Foreign Policy toward Asia) 1995

University of Pennsylvania China Research and Engagement Fund Grant (project on the United States, China and International Law), 2016

University of Pennsylvania Center for East Asian Studies, U.S. Department of Education National Resource Center Course Development Grant (for two linked courses: Public International Law, and China and International Law), 1999

University of Pennsylvania Center for East Asian Studies, U.S. Department of Education National Resource Center Conference Grant, 1998, 2004

University of Pennsylvania Research Foundation, 1996-97

Dissertation Fellowship, Institute for the Study of World Politics, 1990-91

NCR Foundation Fellowship, Harvard University Council on East Asian Studies (for dissertation field research in China), 1990

[13]

Kukin Scholar, Harvard Academy for International and Area Studies, Harvard University (for research combining regional studies and a social science discipline), 1986-88

Sears Prize, Harvard Law School (awarded to the two students receiving the highest averages in work of the second year of law school), 1986

Graduate School of Arts and Sciences Fellow, Harvard University (awarded for academic merit to ten students, throughout the Graduate School of Arts and Sciences, who have completed departmental Ph.D. qualifying exams), 1986-87

Foreign Language and Area Studies Fellowship, Harvard University (for study at Harvard Law School), 1989-90; (for study at the Chinese Language School, Middlebury College), 1985

**OTHER EXPERIENCE / PROFESSIONAL ACTIVITIES / SERVICE:**

Consultant, expert witness on issues of Chinese law and government policies, in litigation in federal and state courts, arbitration proceedings, and proceedings before federal agencies, 1996-

Senior Fellow, Foreign Policy Research Institute, 1999-; Director of the Asia Program, 2002-

Member, National Committee on United States-China Relations, 2001-

American Society of Comparative Law, Board of Directors, 1996-

Associate Member, International Academy of Comparative Law, 2006-

Board of Editors, ORBIS, 2004-

Editorial Advisory Board, JOURNAL OF CONTEMPORARY CHINA, 2007-

Editorial Board, FRONTIERS OF LAW IN CHINA, 2010-

Editorial Board, CHINA (TAIWAN) YEARBOOK OF INTERNATIONAL LAW, 2014-

Editorial Advisory Board, ASIAN JOURNAL OF COMPARATIVE LAW, 2016-

Co-editor, series on Chinese and Comparative Law, Brill / Nijhoff publishers, 2014-

Vice Chair, Pacific Rim Interest Group, American Society of International Law, 2003-05, 2012-13

Member, U.S. Delegation, U.S.-China Rule of Law Experts Dialogue, 2013, 2015

[14]

Consultant, Asia Foundation Rule of Law in China Project on Administrative Law, 2000

Tsinghua University / Temple University Law School Program Series of Conferences on Law Reform, 2002-2004

Member, Advisory Council, International Council on Intellectual Property Rights (China), American International Education Foundation, 2004-2006

Fellow, Institute for Corean-American Studies, 1999-

Board of Advisors, Russian American Institute for Law and Economics, 2000-2004

Consultant, Russian American Institute for Law and Economics (report on U.S. legal advice and assistance programs in Russia and elsewhere), 2000-2004

Council for International Educational Exchange, Fulbright Senior Scholars Awards, peer review awards panel (China, Taiwan, Hong Kong), 2000-2002; distinguished chair awards panel (law), 2003-

University Grants Committee (Hong Kong), Research Grants Council, peer reviewer, 1998-; Member, Humanities and Social Sciences Panel, 2007-2013

External Review Panel, University of Hong Kong Law Faculty, 2015, 2017, 2018

Research Assessment Exercise Panel Member, all law faculties in Hong Kong, 2014

External Examiner, Administrative and Constitutional Law, City University of Hong Kong, 2005-2015

Academic Advisory Board, Tsinghua University / Temple University School of Law Masters of Law Program in Beijing, 1997-

Lecturer, programs on American, comparative, and international law for Chinese lawyers, 1995-

Ad Hoc Study Group on Human Rights in China (report and brief on Tiananmen Incident of June, 1989, and its aftermath, presented jointly with the International League for Human Rights to the principal human rights subcommission of the United Nations), 1989

Harvard International Law Journal, Articles Editor (including special issue on legal reforms in China) 1987

Harvard University, Teaching Fellow, 1985-1992
Courses: The Chinese Cultural Revolution; Government and Politics of China;

[15]

China After Mao: A New Revolution? (Institute of Politics seminar, Kennedy School of Government); International Organizations; Modern Political Ideologies

Peking University, Department of International Politics, Visiting Researcher, 1990, 1991

Chinese University of Hong Kong, Universities Service Centre, Research Affiliate, 1989, 1991

Summer Associate, Paul, Weiss, Rifkind, Wharton & Garrison (New York, 1986), Baker & McKenzie (New York, 1984), Townley & Updike (New York, 1983)

Research Assistant, Program in New Jersey Affairs, Woodrow Wilson School, Princeton University, summer 1982

Matsushita Electric Industrial Corporation, Osaka, Japan (program for foreign students of business and economics), summer 1981

**LANGUAGES:**  Chinese (Mandarin), French